UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **MEMORANDUM & ORDER** |
| -against- | **23-CR-227 (NGG)** |
| JASMINE FOX, | |
| Defendant. | |

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before this court are Defendant Jasmine Fox's and the Government's respective motions *in limine*, as well as their opposition and reply briefs. (Fox's Mot. (Dkt. 130); Government's Mot. ("Gov't Mot.") (Dkt 132); Fox's Opp. (Dkt. 139); Government's Opp. ("Gov't Opp.") (Dkt. 142); Fox's Reply (Dkt. 147); Government's Reply ("Gov't Reply") (Dkt 150).) For the reasons set forth below, the court GRANTS in part and DENIES in part the Government's motions *in limine* and DENIES Fox's motions *in limine*.

## I.   BACKGROUND

### A.   Factual Background

The court presumes the parties' familiarity with the underlying facts and procedural history of the case. *See United States v. Fox*, No. 23-CR-227 (NGG), 2024 WL 3520767, at *2-4 (E.D.N.Y. July 24, 2024) (summarizing background facts of the case). In brief, in July 2021, Special Agent Edward Shapiro of Homeland Security Investigations ("HSI") began investigating potential criminal activities involving employees working at LaGuardia Airport ("LGA"), including those employed by Delta Air Lines ("Delta"). *Id.* at *2. Special Agent Shapiro opened a formal investigation on September 21, 2021. *Id.* After issuing administrative summonses to multiple Paycheck Protection Program ("PPP") lenders, reviewing information from open-source records, and gathering

law enforcement evidence, Special Agent Shapiro came to believe that Fox, a flight attendant working for Delta, and her husband, were engaging in PPP fraud. *Id.*

Based on his belief, Special Agent Shapiro tracked Fox's travel and learned that Fox would return from Colombia to Miami International Airport ("MIA") on November 13, 2021. *Id.* Special Agent Shapiro instructed HSI Special Agent Christopher Bondura to inspect Fox upon her arrival at MIA. *Id.* Special Agent Bondura, in turn, asked the U.S. Customs and Border Protection ("CBP") officers at MIA to conduct the inspection. *Id.* Thereafter, when Fox arrived at MIA, CBP officers took her to an interview room for a secondary inspection. *Id.* After CBP officers asked Fox certain questions related to the ongoing investigation launched by Special Agent Shapiro, as part of the questioning, Fox gave her laptop and cellphone to the officers. *Id.* at *2-3. Neither the CBP officers, nor Special Agent Bondura searched the devices. *Id.* at *3. Instead, per Special Agent Shapiro's request, later that day, Special Agent Bondura shipped the laptop and the cellphone to Special Agent Shapiro in New York. *Id.*

Three days later, on November 16, 2021, Special Agent Shapiro received the devices in New York and manually searched Fox's cellphone. *Id.* Almost a month later, on December 10, 2021, he applied for a warrant to conduct a forensic search of the devices. *Id.* In his affidavit, Special Agent Shapiro swore, among other things, that HSI came into possession of Fox's devices incident to a lawful border search. *Id.* at *4. Magistrate Judge Robert M. Levy signed the warrant which allowed Special Agent Shapiro to proceed with a forensic search of Fox's devices. *Id.* The instant Indictment followed. (*See generally* Indictment (Dkt. 1).)

The Government alleges that Defendants conspired to defraud the U.S. Small Business Administration's ("SBA") PPP program. (*Id.* ¶ 11.) The PPP program provided forgivable loans to small businesses to assist with job retention and certain other expenses

during the COVID-19 pandemic. (*Id.* ¶ 6.) Under the program's rules, borrowers could "receive loans of up to 2.5 times their businesses' average monthly payroll." (*Id.* ¶ 18.) According to the Government, the alleged scheme involved filing fraudulent PPP loan applications on behalf of borrowers who did not qualify for loans, in exchange for "commissions" taken from the loans. (*Id.* ¶ 11.) As part of the scheme, the Government alleges that Defendants created false tax documents before using them "as support for the fraudulent PPP loan applications." (*Id.* ¶ 14.) The Indictment further alleges that Defendants' "scheme involved more than 90 fraudulent PPP applicants," who "resided in at least 12 states, including New York." (*Id.* ¶ 15.) The Government estimates that the SBA and the banks associated with the PPP program "wire-transferred sums totaling approximately $3.5 million from more than 120 PPP loans to bank accounts associated with the applicants used by the defendants." (*Id.* ¶ 20.)

### B.   Procedural History

The Government charged Defendants Jasmine Fox, Kariva Cross-McKnight, Maneka Duffy, Dominique Flynn, and Loren Parker Jr. in a single-count indictment on May 25, 2023. (*See generally* Indictment.)[1] The sole count in the Indictment alleges Wire Fraud Conspiracy, in violation of 18 U.S.C. §§ 1343, 1349. (*Id.* ¶¶ 21-22.) On July 24, 2024, this court granted Fox's motion to suppress all evidence obtained as a result of the unconstitutional manual search of her cellphone and the ensuing forensic search of her laptop and cellphone. *See generally Fox*, 2024 WL 3520767. As relevant here, this court concluded that Special Agent Shapiro "violated Defendant Fox's Fourth Amendment

---

[1] All of the Defendants, except for Fox, have since entered a Plea of Guilty. (Min. Entry Dated 3/5/2024 (Dkt. 78) (Cross-McKnight Plea); Min. Entry Dated 5/2/2025 (Dkt. 125) (Parker Plea); Order Accepting Parker Plea (Dkt. 151); Min Entry Dated 5/12/2025 (Dkt. 135) (Flynn Plea); Min. Entry Dated 5/14/2025 (Dkt. 136) (Duffy Plea).)

rights and the good-faith exception to the exclusionary rule does not apply." *Id.* at *28. Although the Government initially contemplated filing a motion for reconsideration, (*see* Gov't Letter Dated 8/7/2024 (Dkt. 95)), and filed a protective notice of appeal to the Second Circuit, (*see* Not. of Appeal (Dkt. 99) at 1), it did not file such a motion and eventually withdrew its appeal. (*See* Mandate (Dkt. 105).)

On January 21, 2025, the court scheduled Fox's trial to begin on June 30, 2025. (Min. Entry Dated 1/21/2025.) The parties' motions *in limine* followed. On June 10, 2025, the court held an evidentiary hearing on the parties' competing motions *in limine* regarding suppressing Fox's post-arrest statements made on June 13, 2023. (Min. Entry Dated 6/11/2025.) Two days later, the court granted Fox's request to continue her trial date from June 30, 2025, to November 3, 2025. (Text Order Dated 6/12/2025.)

## II. LEGAL STANDARD

An *in limine* motion "aid[s] the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996); *see also United States v. Bowen*, 511 F. Supp. 3d 441, 446 (S.D.N.Y. 2021) (applying the same reasoning in a criminal case).[2] "A court will exclude evidence on a motion *in limine* only if it is clearly inadmissible on all potential grounds." *Laureano v. City of New York*, No. 17-CV-181 (LAP), 2021 WL 3272002, at *1 (S.D.N.Y. July 30, 2021) (emphasis altered). The Federal Rules of Evidence ("FRE" or "Rules of Evidence") govern the admissibility of evidence at trial.

---

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

"[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." *Ohio Cas. Ins. Co. v. Twin City Fire Ins. Co.*, No. 14-CV-858 (NGG) (PK), 2019 WL 1365752, at *2 (E.D.N.Y. Mar. 26, 2019) (emphasis altered). "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, No. 9-CR-1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139). During trial, the court may also exercise discretion "to alter a previous *in limine* ruling." *Luce v. United States*, 469 U.S. 38, 41-42 (1984).

### III. DISCUSSION

#### A. GOVERNMENT'S MOTIONS

The Government moves *in limine* to (1) defer any taint litigation until after trial; (2) introduce call-detail records, loan agreements, bank emails, and other related documents; (3) introduce statements and identities of Fox's charged and uncharged co-conspirators, including Witness-1, who is prepared to testify at trial; (4) use any suppressed evidence as impeachment evidence; (5) introduce evidence about Fox's allegedly fraudulent application for other loan funding—the Economic Injury Disaster Loan ("EIDL") program—from the SBA; (6) exclude evidence or argument regarding the propriety of the searches of Fox's electronic devices (or the absence of evidence from those devices and related electronic accounts); (7) exclude evidence or argument concerning whether Fox should have been prosecuted somewhere other than this district; (8) exclude evidence or argument about potential punishment, Fox's prior good acts, her lack of prior bad acts, uncharged defendants, and other irrelevant topics; (9) preclude Fox from victim-blaming, including by introducing evidence and arguments concerning alleged negligence by banks or the SBA; (10) exclude evidence on the

5

widespread nature of PPP fraud or the lack of fairness targeting Fox's particular PPP scheme; (11) preclude the improper use of law enforcement reports in impeaching government witnesses; and (12) order Fox to produce materials pursuant to Federal Rules of Criminal Procedure 16 and 26.2, as well as trial exhibits, in a timely fashion. (Gov't Mot. at 1-2.)[3] The court addresses each motion in turn below.

### 1.    Taint-Related Suppression

As an initial matter, the Government asks the court to delay any decision regarding what evidence constitutes the so-called "fruit of the poisonous tree"[4] or taint[5] of law enforcement's illegal search of Fox's personal devices *until after trial*. (Gov't Mot. at 8-9.) Fox counters that the Government's request, if granted, "would bear a distinct risk of having to do the trial all over again," and requests that this court deny the Government's motion "as inefficient and risking impingement on the defendant's fair trial

---

[3] The Government and Fox also simultaneously move to introduce (as the Government requests) or preclude (as Fox requests) Fox's post-arrest statements. (*See* Gov't Mot. at 30-36; *see also* Fox's Mot. at 7-14.) The court will issue a separate decision on those competing motions. Furthermore, although the Government initially moved to admit relevant forensic data from Fox's co-Defendants' email accounts, (*see* Gov't Mot. at 36-37), on May 19, 2025, the Government informed the court that it "no longer intends to offer such data in its case-in-chief." (Gov't Letter to Court Dated 5/19/2025 (Dkt. 138); Fox's Opp. at 1 n.1 (acknowledging the same).) As such, because that issue is now moot, the court does not address it.

[4] The Supreme Court has previously explained that "the exclusionary rule—the rule that often requires trial courts to exclude unlawfully seized evidence in a criminal trial . . . encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016).

[5] "An unlawful search taints all evidence obtained at the search or through leads uncovered by the search." *United States v. Paroutian*, 299 F.2d 486, 489 (2d Cir. 1962).

right." (Fox's Opp. at 2.) The court agrees with Fox and decides taint-related issues in this opinion.

The general rule is that where law enforcement obtains evidence through an illegal search, that evidence "has been come at by exploitation of that illegality," and is "taint[ed]." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (explaining that tainted evidence cannot be used against the defendant). The parties share the burden here: "[t]he burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction" that the evidence is tainted. *Nardone v. United States*, 308 U.S. 338, 341 (1939). But the Supreme Court has also acknowledged that "when an illegal search has come to light, [the Government] has the ultimate burden of persuasion to show that its evidence is untainted." *Alderman v. United States*, 394 U.S. 165, 183 (1969). However, "at the same time," the defendant "must go forward with *specific evidence* demonstrating taint." *Id.* (emphasis added). This process "leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin." *Nardone*, 308 U.S. at 341. And "the case law makes clear that . . . there is no *pre-hearing* burden on the defendant to demonstrate taint in a substantial portion of the Government's case." *United States v. Vilar*, 530 F. Supp. 2d 616, 641-42 (S.D.N.Y. 2008) (clarifying that "Defendants are entitled to some opportunity— either during trial or at a pre- or post-trial hearing—to demonstrate taint"); *see also United States v. Leong,* 536 F.2d 993, 997 (2d Cir. 1976) (rejecting the defendant's assertion that the trial court erroneously failed to conduct a post-trial taint hearing because the defendant "failed to sustain his initial burden of making some showing of the existence of taint" during the trial). All in all, "it is beyond doubt that . . . a [taint] hearing need not be convened upon Defendants' request, *if at all*." *Vilar*, 530 F. Supp. 2d at 642 (emphasis added).

Here, Fox highlights specific evidence that she believes is tainted by law enforcement's illegal search of her devices, namely, her cellphone and laptop. (*See* Fox's Mot. at 4-7.) The Government also acknowledges that "[t]o the extent that the defendant in a 'sufficiently particular[] request' has identified specific pieces of evidence to challenge, the Court may decide those discrete matters before trial[.]" (Gov't Mot. at 9.) Except for Fox's request for a hearing regarding her post-arrest statements, which this court held on June 10, 2025, (Min. Entry Dated 6/11/2025), neither party has asked for a pre-trial hearing to determine what evidence is tainted. To the extent Fox points to "specific evidence demonstrating taint," this court decides below, based on the parties' submissions, whether such evidence is tainted by law enforcement's illegal search of Fox's personal devices. *See Alderman*, 394 U.S. at 183 (requiring the defendant to identify specific evidence). As Fox correctly points out, this approach also reduces the "distinct risk of having to do the trial all over again," should this court defer decision on what evidence is tainted until after trial. (Fox's Opp. at 2.) As such, the court denies the Government's request to delay taint litigation until after trial and addresses the relevant taint-related arguments in this opinion.

### 2. Loan Documents, Business Emails, and Related Records

Second, the Government intends to offer the following categories of documents (obtained through administrative subpoenas) into evidence, arguing that they "are admissible as verbal acts or as business records": (a) SBA loan contracts; (b) bank records; (c) tax records; (d) telephone metadata ("call detail records" or "toll records");[6] (e) IP address records; (f) loan applications and application-related materials; and (g) business emails written by

---

[6] The court will refer to these records as call detail records, phone records, or toll records, interchangeably. Telephone metadata, "sometimes referred

lenders. (Gov't Mot. at 9-11.) The Government maintains that these documents are not fruits of the illegal search, and "[t]o the extent that the defendant argues that these records are fruits of the device searches," they were obtained before "those searches (or based on information derived from law enforcement action prior to those searches)." (*Id.* at 11.) As such, it is the Government's position that these records "should be admitted under the inevitable discovery doctrine, the independent source rule, or alternatively the attenuation doctrine." (*Id.*)

Fox does not dispute that the SBA loan contracts "that were obtained by subpoena either prior to the illegal search of [her] electronic devices or as a direct follow-up to a subpoena issued prior to that illegal search" are not hearsay and are admissible "[i]f properly authenticated, and shown to be relevant to" her. (Fox's Opp. at 3.) Similarly, Fox agrees that bank records, tax records, toll records, and IP address records are not fruits of the Government's illegal search, and "would seem to be admissible under the business records exception," so long as they are "properly authenticated, shown to be relevant to [her], and properly certified as business records" pursuant to FRE 803(6). (*Id.*)[7] However, Fox contends that materials submitted with loan applications and business emails are not admissible under any hearsay exception. (*Id.* at 3-4.) The court first addresses whether

---

to as call detail records," "does not include the contents of a telephone call, but rather the details *about* the call, such as the length of the call, the phone number from which the call was made, and the phone number at which the call was received." *Am. C.L. Union v. Clapper*, 804 F.3d 617, 619 (2d Cir. 2015).

[7] Fox conditions her agreement on the above-mentioned records "pertain[ing] only to the LaGuardia Airport-based employees and three companies already under investigation prior to the illegal search of [her] electronic devices." (Fox's Mot. at 3.) Fox presumably refers to the following three companies that were already under investigation before the illegal search: Credit Benders, LLC; DS Alliance Co Corporation; and Reveal Collection LLC. (Gov't Mot. at 11.)

these records constitute fruits of the illegal search. Next, it turns to their admissibility under the relevant Rules of Evidence.

### a. Fruits of the Illegal Search

The court finds that none of the above-referenced categories of records that the Government intends to offer into evidence constitute fruits of the poisonous tree because they were either obtained through administrative subpoenas issued before the illegal search (or as a direct follow-up to such subpoenas) or fall under the inevitable discovery doctrine's exception to the exclusionary rule even though the Government obtained them after the illegal search.

The parties agree that records obtained pursuant to administrative subpoenas before the illegal search or as a direct follow-up to such subpoenas are not tainted. (*See* Gov't Mot. at 9; Fox's Opp. at 3; Gov't Reply at 2-3.) 

HSI issued these subpoenas *before* the illegal search on November 13, 2021.

---

[8] The Government's motion refers to these emails as "emails written by Lenders while they considered, evaluated and discussed borrowers' (including the defendant's) fraudulent PPP loan applications." (Gov't Mot. at 10.) Furthermore, in the "Preliminary Statement" section of its brief, the Government calls these emails "bank emails." (*Id.* at 1.)

*see also* Gov't Reply at 4 (mentioning "emails from PPP lenders requesting additional documentation from the applicant to supplement their application").)

10

As such, the court need not address any of the exceptions to the exclusionary rule because it concludes that the aforementioned records are not fruits of the illegal search. Now, the court turns to certain records—namely, tax and toll records—obtained by the Government *after* the illegal search.

The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. While the text of the amendment does not explicitly state "when a search warrant must be obtained, th[e] [Supreme Court] has inferred that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). At times, the Supreme Court has "required courts to exclude evidence obtained by unconstitutional police conduct" in order "[t]o enforce the Fourth Amendment's prohibition against 'unreasonable searches and seizures.'" *Strieff*, 579 U.S. at 234-35. The exclusionary rule is "the principal judicial remedy to deter Fourth Amendment violations." *Id.* at 237. The rule "encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Id.*; *United States v. McKenzie*, 13 F.4th 223, 231 n.5 (2d Cir. 2021) (noting that "[u]ntil the 20th century, unconstitutional searches and seizures were remedied through civil suits against the trespassing officers," but courts have since developed the exclusionary rule). "The core rationale . . . for extending the exclusionary rule to evidence that is the fruit of unlawful police

11

conduct has been . . . to deter police from violations of constitutional and statutory protections." *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). Nevertheless, the Supreme Court has acknowledged several exceptions to the exclusionary rule. *Strieff*, 579 U.S. at 238 (discussing three relevant exceptions "involv[ing] the causal relationship between the unconstitutional act and the discovery of evidence").

"First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquire it from a separate, independent source." *Id.* In particular, "when a search warrant is obtained after an unlawful entry [or search], and evidence is seized pursuant to the later warrant-backed search, that evidence is admissible if the warrant derives from sources independent of the prior unlawful entry [or search]." *United States v. Schleede*, No. 22-440, 2023 WL 3451401, at *2 (2d Cir. May 15, 2023) (summary order) (citing *Murray v. United States*, 487 U.S. 533, 537-38 (1988)). The principle behind this doctrine is that "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Nix*, 467 U.S. at 443. For the independent source doctrine to apply, two elements must be satisfied: first, "the warrant [or subpoena] must be supported by probable cause derived from sources independent of the illegal entry" or conduct, and second, "the decision to seek the warrant [or subpoena] may not be prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993); *Vilar*, 530 F. Supp. 2d at 633-34 (applying independent source doctrine to subpoena obtained following an invalid warrant). The burden of proof is on the Government to "establish[] by a preponderance of the evidence that the independent source doctrine applies." *United States v. Bonczek*, No. 8-CR-361 (PAC), 2008 WL 4615853, at *6 (S.D.N.Y. Oct. 16, 2008) (citing *Murray*, 487 U.S. at 540).

Second, "[u]nder the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006) (quoting *Nix*, 467 U.S. at 447). This doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) ("*Eng II*"). It is "an extrapolation from the independent source doctrine": because "the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray*, 487 U.S. at 539. "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5; *see also United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992) ("*Eng I*") (recognizing that "inevitable discovery analysis must begin with the progress of the investigation at the time of the government misconduct" because the "inquiry [must] focus on 'demonstrated historical facts' so as to keep speculation to an absolute minimum"). In summarizing the Supreme Court's opinion in *Nix*, the Second Circuit has said the following about the inevitable discovery doctrine:

> Indeed, the facts of cases applying the inevitable discovery doctrine suggest that proof of inevitability is made more convincing when the areas of the search or investigation are well-defined, the government effort is planned and methodical, and a direct causal relationship and reasonably close temporal relationship exist between what was known and what had occurred prior to the government misconduct and the allegedly inevitable discovery of the evidence.

*Eng I,* 971 F.2d at 859. Again, the prosecution carries the burden of proof by a preponderance of the evidence. *Nix,* 467 U.S. at 444 (explaining that if the government can meet its burden "then the deterrence rational has so little basis that the evidence should be received" because "[a]nything less would reject logic, experience, and common sense"); *see also Eng I,* 971 F.2d at 862 ("The district court must, for each particular piece of evidence, specifically analyze and explain how, if at all, discovery of that piece of evidence would have been more likely than not inevitable absent the [illegal] search[.]").

Third, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Strieff,* 579 U.S. at 238; *see also Nardone,* 308 U.S. at 341 (explaining that when the connection between government misconduct and a lawful search is attenuated, such a remote causal link "dissipate[s] the taint"). Courts look to three factors to determine whether there is "a sufficient intervening event . . . break[ing] the causal chain between" the unlawful act and the discovery of evidence. *Strieff,* 579 U.S. at 239. First, the court looks to "the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search." *Id.* This factor favors attenuation where "substantial time elapses between an unlawful act and when the evidence is obtained." *Id.* However, "[a] space of only minutes after the illegal [act] counsels against attenuation." *United States v. Walker,* 965 F.3d 180, 188 (2d Cir. 2020). Second, the court considers "the presence of intervening circumstances." *Strieff,* 579 U.S. at 239. For instance, "[a] valid warrant that predates the unconstitutional conduct and is entirely unconnected with the [illegal act] supports attenuation." *Walker,* 965 F.3d at 188. Third, and "particularly significant," the court "examine[s] the purpose and flagrancy of the official misconduct." *Strieff,* 579 U.S. at 239. Mere negligence by law

14

enforcement weighs in favor of attenuation. *Walker*, 956 F.3d at 188. Similarly, courts are more likely to deny suppression of evidence in "the absence of any indication that th[e] [unlawful act] was part of any systemic or recurrent police misconduct, a suspicionless fishing expedition, or a dragnet search for outstanding arrest warrants." *Id.* Like the first two exceptions to the exclusionary rule, the Government carries the burden of proof. *See United States v. Ghailani*, 743 F. Supp. 2d 242, 259 (S.D.N.Y. 2010) ("[T]he burden of proof on the attenuation claim is on the government.").

It is worth noting that "despite the identification of discrete headings for the[se] exceptions, their applications and rationales overlap enough that [the Second Circuit] view[s] them more as helpful guides than as rigid tests." *United States v. Alvarez-Porras*, 643 F.2d 54, 60 (2d Cir. 1981). Put differently, they all "rest[], most basically, on the lack of a sufficiently close connection between the [government's] wrongdoing and the invasion of the defendant's reasonable expectation of privacy." *Id.*

The Government concedes that it obtained certain tax and toll records after the illegal search. (Gov't Mot. at 16.) Nevertheless, it argues that such records "should be admitted as well" because they are "traceable" to documents obtained prior to the search of Fox's phone. (*Id.*) As an initial matter, these records are not admissible pursuant to the independent source doctrine. The Government attempts to lump the records into one category without distinguishing between those acquired in response to summonses issued before the illegal search—

—and those it obtained after the illegal search, (*See* Gov't Mot. at 18.) Indeed, the HSI subpoenas do not even reference any tax records. The court cannot accept the Government's self-serving representation

that the relevant "tax and phone records for those LGA employ-
ees obtained after the device searches" are traceable to the
documents obtained before the illegal search. (*Id.* (arguing that
evidence traceable to documents "produced as a result of sub-
poenas prior to the search" are clearly admissible without
explaining why).) The Government fails to show that it obtained
these particular tax and toll records "from sources independent
of the illegal [search]" of Fox's devices because it points to no
such source. *Johnson*, 994 F.2d at 987. And the burden of proof
is on the Government to "establish[] by a preponderance of the
evidence that the independent source doctrine applies." *Bonczek*,
2008 WL 4615853, at *6.

Similarly, the Government's conclusory arguments about the at-
tenuation doctrine are also lacking. (Gov't Mot. at 18-19.) The
Government has not provided enough information for the court
to evaluate the remoteness of the connection between the illegal
search and the relevant tax and toll records. *Strieff*, 579 U.S. at
238. For the court to decide whether the lack of a causal link
"dissipate[s] the taint," it must know when—*i.e.*, how long *after*
the illegal search—the Government obtained the relevant rec-
ords. *See Nardone*, 308 U.S. at 341; *Strieff*, 579 U.S. at 239
(explaining that the first factor of the attenuation analysis does
not favor attenuation unless "substantial time elapses between
an unlawful act and when the evidence is obtained"). The Gov-
ernment's submission provides no information to shed light on
the timeline. Nor does the Government discuss "the presence of
intervening circumstances," or "examine the purpose and fla-
grancy" of the illegal search. *See Strieff*, 579 U.S. at 239 (noting
that the latter factor is "particularly significant"). Although
"[c]onduct that is at most negligent weighs in favor of attenua-
tion," *Walker*, 956 F.3d at 188, the court notes that it previously
"f[ound] that Agent Shapiro's conduct exhibited at least a reck-
less or grossly negligent disregard of [Fox's] Fourth Amendment
rights," *Fox*, 2024 WL 3520767, at *20. Regardless, "the burden

16

of proof on the attenuation claim is on the government," and the Government falls far short of meeting its burden of proof here. *Ghailani,* 743 F. Supp. 2d at 259. As such, these records are not admissible under the attenuation doctrine.

Although the court concludes that the relevant tax and toll records obtained after the illegal search are not admissible under either the independent source or attenuation doctrine, it nevertheless finds that those records are not tainted—and are admissible—because their discovery was inevitable. First, even before the illegal search in November 2021, the Government's investigation of the scheme was in full motion. The court need not speculate to reach this conclusion. *See Nix,* 467 U.S. at 444 n.5 (emphasizing that the doctrine of inevitable discovery "focuses on demonstrated historical facts capable of ready verification or impeachment"); *see also Eng I,* 971 F.2d at 861 (noting that the court's "analysis logically must begin with the progress of the investigation at the time of the government misconduct . . . to keep speculation to an absolute minimum").



Furthermore, HSI's investigation was "well-defined," and its "effort [was] planned and methodical." *Eng I,* 971 F.2d at 859.

17

These investigative steps weigh in favor of finding that the inevitable discovery doctrine applies here.

That leads the court to the conclusion that discovery of both tax and toll records that the Government obtained after the illegal search as to all the LGA employees identified in Guzman's and Colon's affidavits, as well as the records pertaining to Fox and her entities, "would have been more likely than not inevitable absent the [illegal] search." *Eng I*, 971 F.2d at 862. In other words, viewing the Government's investigation as it "existed at the instant before the unlawful search," it is more likely than not that HSI was inevitably going to seek and obtain the relevant tax and toll records. *Eng II*, 997 F.2d at 990. The                                    are the kinds of "demonstrated historical facts" that this court can "read[ily] verif[y]." *Nix*, 467 U.S. at 444 n.5.[9] Therefore, the court finds

---

[9] To be clear,

that the Government has met its burden of proof; the tax and toll records pertaining to the LGA employees identified in Guzman's and Colon's declarations, as well as the tax and toll records pertaining to Fox and her entities that the Government obtained *after* the illegal search are admissible under the inevitable discovery doctrine.[10]

Having concluded that one of the exceptions to the exclusionary rule applies to the above-referenced records, the court now turns to the Rules of Evidence to determine these records' admissibility.

    *b.*   *Admissibility Pursuant to the Rules of Evidence*

    c.   <u>SBA Loan Contracts & Bank, Tax, Call Detail, and IP Records</u>

The court grants the Government's motion *in limine* as to these records and admits them into evidence subject to the limitations set forth below. The Government contends that "loan applications . . . , toll records, documents pertaining to IP addresses, and bank records are admissible non-hearsay." (Gov't Mot. at 9.) In its reply, the Government further argues that "bank statements, . . . tax documents, and copies of voided checks" that are submitted in "[a] typical application for a PPP loan" are not hearsay because they are business records pursuant to FRE 803(6) or public records pursuant to FRE 803(8). (Gov't Reply at 3.) The Government also adds that it would offer the PPP loan applications into "evidence to demonstrate the falsity of statements,"

---

█████████████████████████████ Gov't Mot. at 17.) The court must conduct "[a]n objective analysis," and "keep speculation to an absolute minimum." *See Eng I,* 971 F.2d at 861-62.

[10] As Fox points out, the Government's motion "adds in (without comment) to this list" records pertaining to Defendant Parker and his father. (Fox's Opp. at 3 n.4.) Given that the Government's reply brief does not address Fox's argument as to this issue, the court observes that Defendant Parker's name may have been inadvertently added to the list. Regardless, this court's finding does not apply to records pertaining to Defendant Parker or his father.

which it claims to be a non-hearsay purpose. (*Id.* at 4.) Fox agrees that "signed [loan] contracts are not hearsay" if they are "properly authenticated, and shown to be relevant to" her. (Fox's Opp. at 3.) Likewise, Fox agrees that "[b]ank records, tax records, call detail records and IP records are" admissible under the business records exception "if properly authenticated, shown to be relevant to Ms. Fox, and properly certified as business records," pursuant to FRE 803(6).

The rule against hearsay bars admission of hearsay unless a federal statute, the Rules of Evidence, or "other rules prescribed by the Supreme Court" provide otherwise. Fed. R. Evid. 802. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c); *United States v. Hoffer*, 869 F.2d 123, 126 (2d Cir. 1989) ("A statement does not fit within the definition of hearsay unless it is offered in evidence to prove the truth of the matter asserted."). Where the proponent offers records into evidence to prove the falsity of the statements therein or to link the records to the defendant, courts within the Second Circuit admit such records into evidence because they are not offered for the truth of the matters asserted in the records. *See, e.g.*, *United States v. Pedroza*, 750 F.2d 187, 203 (2d Cir. 1984) (clarifying that a statement offered "for its patent falsity" is not hearsay); *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) (upholding admission of address books for non-hearsay purpose of identifying the defendant); *United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 5868120, at *3 (S.D.N.Y. Dec. 9, 2021) (overruling the defendant's hearsay objection because the phone directory was "not being offered for the truth that the names listed identify a particular individual or that the phone numbers listed next to the names are correct"). Furthermore, "'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance

bearing on conduct affecting their rights," are not hearsay. Advisory Committee Note to Fed. R. Evid. 801(c); *see also* 2 McCormick On Evid. § 249 (9th ed.) (2025). For instance, "[s]tatements, such as contracts, that themselves affect the legal rights of the parties constitute 'verbal acts' and are excluded from the definition of hearsay." *Spencer v. City of New York*, No. 6-CV-2852 (KMW), 2011 WL 13257640, at *1 (S.D.N.Y. July 18, 2011); *see also United States v. Sterritt*, No. 21-CR-193 (KAM), 2023 WL 7386660, at *4 (E.D.N.Y. Nov. 8, 2023) (admitting into evidence various records, including debt instruments and lease purchase agreements, "to establish that [the defendant] and others entered into the relevant contracts and agreements").

Also, FRE 803 delineates categories of exceptions to the rule against hearsay "regardless of whether the declarant is available as a witness." *See generally* Fed. R. Evid. 803 (listing 24 categories of exceptions). As relevant here, records of a regularly conducted activity—colloquially known as the "business records exception"—are one such exception to the rule against hearsay. *See* Fed. R. Evid. 803(6). Similarly, "[a] record or statement of a public office," known as the "public records exception," subject to certain conditions, is also an exception to the rule against hearsay. Fed. R. Evid. 803(8).

Under the business records exception, the court may admit into evidence a record of "an act, event, condition, opinion, or diagnosis" for the truth of the matter asserted in the record if (i) the record was made "at or near the time" of the act or event by someone with knowledge; (ii) the record was kept in the regular course of business; (iii) it was a regular practice to make the record; (iv) a qualified witness testifies to those facts; and (v) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *See* Fed. R. Evid. 803(6)(A)-(E); *see also* Fed R. Evid. 803(6)(D) (noting that, instead of testimony, the proponent may

also satisfy these conditions "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification"). "The principal precondition to admission of documents as business records" under FRE 803(6) "is that the records have sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l, Inc. v. M/V Exp. Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987); *see also* Fed. R. Evid. 803(6)(E); 2 McCormick On Evid. § 286 ("The regularity and continuity of the records are calculated to train the recordkeeper in habits of precision; if of a financial nature, the records are periodically checked by balance-striking and audits[.]").

In general, the business records exception "favors the admission of evidence rather than its exclusion if it has any probative value at all." *Matter of Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) (affirming admission of financial statements into evidence in part because they "were on the Bank's own form, were completed at its request, and were of a type regularly used by the Bank in making decisions [on] whether or not to extend credit"). Moreover, "[t]he custodian need not have personal knowledge of the actual creation of the document." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995). But all of the elements of the business records exception "must be shown by the testimony of the custodian or other qualified witness of the record." *United States v. Freidin*, 849 F.2d 716, 720 (2d Cir. 1988). The ultimate "determination of whether, in all the circumstances, the records have sufficient reliability to warrant their receipt in evidence is left to the sound discretion of the trial judge." *Saks Int'l*, 817 F.2d at 1013; *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 691 (S.D.N.Y. 2014) (admitting bank statements under FRE 803(6) by taking "judicial notice that banks routinely produce periodic statements for their customers and that those periodic statements reflect any and all deposits, withdrawals, debits and credits during stated periods of time"); *United States v. Rabbani*, 382 F.

App'x 39, 41 (2d Cir. 2010) (affirming, by summary order, district court's admission of cellphone records under the business records exception); *Cruz v. Colvin*, No. 17-CV-3757 (JFB), 2019 WL 3817136, at *17 (E.D.N.Y. Aug. 14, 2019) (recognizing that cellphone records were admissible for non-hearsay purpose of identification, as well as under the business records exception); *Boisvert v. United States*, Nos. 13-CV-1878 (VLB) & 11-CR-8 (VLB), 2016 WL 11712083, at *7 (D. Conn. July 29, 2016) (concluding that counsel was not ineffective because counsel "could not have effectively challenged the admissibility of the chat logs and IP logs as they are electronic records contemporaneously generated and maintained in the ordinary course of the regularly conducted business activities of the electronic service providers").

Another exception to hearsay, "[t]he public records exception[,] allows hearsay statements into evidence if the records or statements are made by a public office and the statements are made while under a legal duty to report." *Abascal v. Fleckenstein*, 820 F.3d 561, 566 (2d Cir. 2016). However, in a criminal case, the "legal duty to report" does not encompass a matter observed by law-enforcement personnel. Fed. R. Evid. 803(8)(A)(ii); *see also United States v. Murgio*, No. 15-CR-769 (AJN), 2017 WL 365496, at *7 (S.D.N.Y. Jan. 20, 2017) (explaining that FRE 803(8) "draws a distinction between matters observed while under a legal duty to report, on the one hand, and factual findings from a legally authorized investigation, on the other," and that, "[p]er the rule, the former are admissible in a criminal case unless observed by law-enforcement personnel," and "the latter, in contrast, may not be admitted in a criminal case against a defendant"); *Malkin v. United States*, 243 F.3d 120, 123 (2d Cir. 2001) (holding that under the public records exception, "it was the duty of IRS employees to receive Form 872 statute-of-limitations waivers from any given taxpayer and to record them in the IRS data files for that taxpayer's pertinent year"). While certain

government agency reports are covered by the public records exception, in a criminal case, "documents contain[ing] . . . evaluative conclusions, legal conclusions, [or] recommendations [that] go well beyond simple matters observed" are inadmissible against the defendant. *Murgio*, 2017 WL 365496, at *9-12 (concluding that certain records prepared by the National Credit Union Association are inadmissible because they contain factual findings from a legally authorized investigation). Similar to the business records exception, the court may not admit a document into evidence under this exception if the opponent "show[s] that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Also like the business records exception, the Second Circuit "generally favor[s]" admission of public records into evidence. *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991) ("This presumption of admissibility extends not merely to factual determinations in the narrow sense, but also to conclusions or opinions that are based upon a factual investigation.").

Here, the parties agree that the SBA loan contracts are not hearsay. (Gov't Mot. at 9-10; Fox's Opp. at 3.) So does the court. These contracts are verbal acts "affect[ing] the legal rights of" those who received the PPP loans from the SBA via the PPP lenders. *See* Advisory Committee Note to Fed. R. Evid. 801(c); *see also* 2 McCormick On Evid. § 249. As such, the SBA loan contracts "are excluded from the definition of hearsay." *Spencer*, 2011 WL 13257640, at *1. The court grants the Government's motion *in limine* as to the SBA loan contracts. The Government can offer the contracts into evidence to establish that the relevant parties entered into a contract with the SBA or the PPP lenders, or both. Alternatively, the Government may also offer them into evidence to prove the falsity of the statements therein. *See Pedroza*, 750 F.2d at 203 ("The testimony was not hearsay since it plainly was not offered to prove the truth of the matter asserted. . . . Rather, the statement was offered for its patent falsity.").

Next, the bank statements and information pertaining to such statements, toll records, and IP address records[11] are admissible as records of a regularly conducted activity pursuant to FRE 803(6). Alternatively, to the extent the Government intends to offer them into evidence for identification purposes only, they are also admissible for such non-hearsay purposes. This court, like the court in *Chevron Corp.* did, "takes judicial notice that banks routinely produce periodic statements for their customers and that those periodic statements reflect any and all deposits, withdrawals, debits and credits during stated periods of time." 974 F. Supp. 2d at 691. Furthermore, "[t]his is done in the regular course of business by bank employees with knowledge of the computer systems used to track customers' account activity." *Id.* Fox has "not show[n] that the source of information or the method or circumstances of preparation [of bank statements] indicate a lack of trustworthiness." *See* Fed. R. Evid. 803(6)(E); (Fox's Opp. at 3 (agreeing that the bank records "would seem to be admissible" under the Rules of Evidence "if properly authenticated [and] shown to be relevant to Ms. Fox").) Given the possibility that the bank records may reveal links to certain transactions related to the alleged scheme, the court heeds the Second Circuit's preference towards admitting these records as they appear to have some probative value. *Matter of Ollag,* 665 F.2d at 46 (affirming admission of bank records that appear to have probative value).

Likewise, the court admits the IP and toll records into evidence under the business records exception. As to the former, the court concludes that "they are electronic records contemporaneously generated and maintained in the ordinary course of the regularly conducted business activities of the electronic service providers."

---

[11] The Government describes these records as "AT&T and Verizon records revealing subscriber information associated with the IP addresses used to access the loan applications." (Gov't Mot. at 11.)

*Boisvert*, 2016 WL 11712083, at *7 (noting that the IP logs as a whole "did not reflect any irregularity"); *see also United States v. DiTomasso*, 932 F.3d 58, 61 (2d Cir. 2019) (explaining that "[a]n IP address contains information with regard to, *inter alia*, the geographic location from which a device connects to the internet, although it does identify the person using the device"). As to the latter, the court finds that, in general, cellphone records "are kept over the course of regular business, and the records are made at the time the events occur." *Cruz*, 2019 WL 3817136, at *17 (emphasizing that the testimony established the necessary elements under FRE 803(6)). Thus, the court exercises its "sound discretion," and grants the Government's motion *in limine* as to all of these records. *See Saks Int'l*, 817 F.2d at 1013.

If the Government intends to offer these records into evidence for the purposes of identifying the account owners or linking the loan applications to certain individuals, including Fox, the court also finds that these records are admissible for such limited non-hearsay purposes. *See United States v. Londono*, 175 F. App'x 370, 373 (2d Cir. 2006) ("The district court did not admit the wire receipts under Rule 803(6), . . . but instead admitted the receipts for the limited purpose of demonstrating that a transaction occurred and that someone claiming to be [one of the defendants] was involved in it."); *Al-Moayad*, 545 F.3d at 176 (concluding that "[t]he address books were not hearsay" because "[t]he government did not rely on them to establish that the phone number listed next to [the defendant's] name was, in fact, his phone number"); *Maxwell*, 2021 WL 5868120, at *3 ("The Second Circuit has affirmed the admission of documents that provide names and contact information for the non-hearsay purpose of linking the individual that possessed that document to that name or phone number, rather than for the truth of that contact information.").

To that end, the court grants the Government's motion *in limine* to admit the bank, toll, and IP address records into evidence under the business records exception; provided that the Government produces a qualified witness to lay the foundation for these records as set forth under FRE 803(6)(A)-(D) and "introduce[s] certified copies" of these records in compliance with FRE 803(6)(E), as the Government intends to do. (Gov't Mot. at 11 n.4.) Alternatively, the Government may offer the records into evidence for identification purposes—instead of for the truth of the matters asserted—only.

Third, the court finds that the tax records, like "a fact-of-filing letter prepared by IRS staff," (*id.* at 16), are admissible pursuant to the public records exception under FRE 803(8) as long as the records "set[] out" IRS's activities, Fed. R. Evid. 803(8)(A). Congress authorizes and requires the IRS "to make the inquiries, determinations, and assessments of all taxes . . . which have not been duly paid by stamp at the time and in the manner provided by law." 26 U.S.C. § 6201(a). As such, the records produced by the IRS fall under its "legal duty to report" within the meaning of FRE 803(8)(A)(ii). *See Malkin*, 243 F.3d at 123 (discussing the "the duty of IRS employees to receive Form 872 statute-of-limitations waivers from any given taxpayer and to record them"). Again, Fox does not come forward with any "source of information or other circumstances indicat[ing] a lack of trustworthiness." Fed. R. Evid. 803(8)(B). As such, the court finds that these records are admissible as long as the Government can show that they set out the IRS's activities. *See Gentile*, 926 F.2d at 148 ("Reports such as those issued by the [state] Commission are presumed to be admissible in the first instance[.]"). Accordingly, the court grants the Government's motion *in limine* to admit the above-referenced tax records into evidence.

In sum, the court admits the above-mentioned records into evidence as follows: the SBA loan contracts are admitted into

evidence as verbal acts or for proving falsity of the statements in those contracts; the bank statements, toll records, and IP records are admitted into evidence pursuant to FRE 803(6), or, in the alternative, for the non-hearsay purpose of identification; and the tax records are admitted into evidence under FRE 803(8).

### d.   Materials Submitted with Loan Applications

According to the Government, "materials submitted with the loan application . . . are admissible non-hearsay" because they are verbal acts. (Gov't Mot. at 9; *see also* Gov't Reply at 3 ("All of these documents are exceptions to hearsay as 'business records' pursuant to Rule 803(6) of the Federal Rules of Evidence, or as 'public records' pursuant to Rule 803(8).").) Fox objects, claiming that "[m]aterials submitted with a loan application are not a 'verbal act,'" and "[i]nformation that a potential borrower sends *to* a lender does not become a business record by virtue of being received by the lender." (Fox's Opp. at 3.) In its reply, the Government states that Fox's objection is "beside the point" because it intends to offer the PPP loan applications into evidence "to demonstrate the falsity of statements made" in those applications. (Gov't Reply at 3-4.) At the same time, the Government maintains that "bank statements, photographs of identification documents ['IDs'], tax documents, and copies of voided checks" are contained in "[a] typical application for a PPP loan," and "are exceptions to hearsay as 'business records'" or "as 'public records.'" (*Id.* at 3.) The court admits these records into evidence subject to the limitations further discussed below.

As an initial matter, none of the documents submitted as part of the loan applications constitute verbal acts. While the SBA loan contracts themselves are verbal acts, the same reasoning does not apply to the materials submitted as part of the loan applications. Neither the applications nor the supporting documents "affect the legal rights of the parties" involved. *Spencer*, 2011 WL 13257640, at *1. These records are not agreements themselves.

*See Sterritt*, 2023 WL 7386660, at *4 (concluding that debt instruments and a lease purchase agreement are verbal acts).

However, for the reasons stated above, *see supra* Part III.A.2.b.i, the bank statements and copies of voided checks that were submitted as part of the loan applications are admissible under the business records exception to hearsay. Fox argues that these documents do not "become a business record by virtue of being received by the lender" because they lack "the guarantees of trustworthiness that come from a record being made by someone with a duty to make an accurate record" and are not made by someone with knowledge and as a regular practice. (Fox's Opp. at 3.) But the Second Circuit has rejected such a narrow reading of the business records exception. It is immaterial that the above-mentioned records are submitted as part of a loan application, instead of being directly provided by the entity that created them. *See United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992) ("Even if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity."). Like in *Jakobetz*, the court finds that the materials submitted with the loan applications that the Government obtained from the PPP lenders "permit[s] an inference" as to those records' authenticity. *Id.*; *see also Atl. Specialty Ins. Co. v. Coastal Env't Grp.*, 368 F. Supp. 3d 429, 451 n.7 (E.D.N.Y. 2018) ("Third-party records may be admitted under the business records exception, . . . where those records have been integrated into another business entity's records and relied on by the business entity."). As such, the bank statements and copies of voided checks are admissible under the business records exception to hearsay.

The court cannot reach the same conclusion, however, with respect to the tax records. The Second Circuit has rejected the idea that privately-generated public records can be admitted into evidence under the public records exception to hearsay without

further foundation. *See United States v. Doyle*, 130 F.3d 523, 546-47 (2d Cir. 1997) (emphasizing that "it would be a major step judicially to forge a new, hybrid exception to the hearsay rule by combining" the business records and public records exceptions "to correct the Government's failing to offer a witness who could present the foundation for the admission of the documents under the business records exception"). As such, the Government cannot introduce the tax documents submitted as part of the PPP loan applications under the public records exception. *See Lakah v. UBS AG*, 996 F. Supp. 2d 250, 257-58 (S.D.N.Y. 2014) (applying *Doyle*'s reasoning to the residual hearsay exception). The Government can nevertheless offer the tax records, as well as the rest of the materials, including bank statements, voided checks, and photographs of IDs submitted with loan applications, for the non-hearsay purpose of showing falsity. *See Pedroza*, 750 F.2d at 203. Moreover, the Government can also offer the photographs of IDs for purposes of identifying the individuals in them. *See Al-Moayad*, 545 F.3d at 176; *Maxwell*, 2021 WL 5868120, at *3.

Therefore, the court grants the Government's motion *in limine* to admit the bank statements and voided checks into evidence under the business records exception. In the alternative, the court also admits these documents into evidence for purposes of proving falsity only. The court also admits the tax records and photographs of IDs submitted as part of the loan application for the non-hearsay purpose of proving the falsity of the records. The Government may also rely on the photographs of IDs for identification purposes rather than for truth of the matters asserted therein.

e.  <u>Business Emails</u>

Similar to its position regarding the PPP loan applications and bank records, the Government avers that the business emails "written by Lenders while they considered, evaluated and discussed borrowers' (including the defendant's) fraudulent PPP

loan applications are admissible under," FRE 803(6), "the business records exception to hearsay." (Gov't Mot. at 10.) Fox counters that these emails "may or may not be part of regular lender activity and would have to be analyzed individually to see where they contain further levels of hearsay." (Fox's Opp. at 4.) The Government changes its position in its reply brief, arguing instead that the emails are admissible "[b]ecause the[y] . . . are not being offered for their truth." (Gov't Reply at 4.) The court finds that these emails are admissible to show their effect on the listener or provide context, but not for proving the truth of the matters asserted therein.

"A party seeking to introduce an email made by an employee about a business matter under the hearsay exception under Rule 803(6) must show that the employer imposed a business duty to make and maintain such a record." *See United States v. Figueroa*, No. 23-CR-161 (MAD), 2023 WL 8373566, at *3 (S.D.N.Y. Dec. 4, 2023) ("Courts examine whether it was the business duty of an employee to make and maintain emails as part of his job duties and whether the employee routinely sent or received and maintained the emails."); *see also United States v. Stein*, No. 5-CR-888 (LAK), 2007 WL 3009650, at *1 (S.D.N.Y. Oct. 15, 2007) (clarifying that the proponent need not show that the emails were created pursuant to established policies; "regularity of making such records and of the business activity is all that is required"). For example, where "the emails all relate to regularly conducted business . . . rather than personal correspondence of the employees, which were kept in the regular course of business," the court may admit them into evidence under the business records exception. *See Figueroa*, 2023 WL 8373566, at *3. But emails "contain[ing] unique and sporadic communications, not created as a record of any regularly conducted business activity," fall outside the business records exception to the rule against hearsay. *New World Trading Co. v. 2 Feet Prods., Inc.*, Nos.

11-CV-6219 (SAS) & 13-CV-1251 (SAS), 2014 WL 988475, at *1 (S.D.N.Y. Mar. 13, 2014).

Fox is correct that emails "are not categorically admissible as business records." (Fox's Opp. at 4.) And making a determination, "in the abstract," as to which of the documents the Government has in mind that satisfy the Rule and which do not would be "impossible." *See Stein*, 2007 WL 3009650, at *1. The Government does not even attempt to make a showing that the PPP lenders sent these emails as part of "a regularly conducted activity" of their businesses. Fed. R. Evid. 803(6)(B). Indeed, the Government appears to abandon its original argument that these emails are admissible pursuant to the business records exception. (Gov't Reply at 4 ("Because these emails are not being offered for their truth, this Court should allow their admission.").) It is just as likely that these emails are "sporadic communications, not created as a record of any regularly conducted business activity," because the PPP lenders may have communicated with applicants or others as needed when questions arose regarding the applications. *See New World Trading Co.*, 2014 WL 988475, at *1 (denying the defendant's motion to admit emails into evidence under the business records exception). Nevertheless, because the Government appears to offer them into evidence to establish their effect on the listener (or provide context) rather than to prove the truth of the matters asserted, the court need not determine whether these emails are admissible as business records.

The Second Circuit has acknowledged that "[a]n inquiry is not an assertion, and accordingly is not and cannot be a hearsay statement." *Quartararo v. Hanslmaier*, 186 F.3d 91, 98 (2d Cir. 1999). As such, the court grants the Government's motion to admit the business emails into evidence to the extent that the Government relies on them to show their effect on the listener or provide context for the emails—not to prove the truth of the matters asserted in the emails.

### 3. Statements and Identities of Charged and Uncharged Co-Conspirators

The Government also "intends to offer in its case-in-chief evidence of statements made by Witness-1, a co-conspirator in the scheme, and others regarding the identities and records pertaining to the certain charged and uncharged co-conspirators pursuant to" FRE 801(d)(2)(E). (Gov't Mot. at 19.) To that end, the Government asks the court to "conditionally admit these statements at trial." (*Id.*) Fox asks that the court "reserve decision on the unidentified out-of-court statements . . . by unspecified other people until the government specifically identifies such statements or conduct so that their admissibility" under the Rules of Evidence "can be gauged." (Fox's Opp. at 4.) Again, the court first addresses whether the statements are tainted because of HSI's illegal search of Fox's devices. Then, the court decides the admissibility of the statements pursuant to the Rules of Evidence.

#### a. *Fruits of the Illegal Search*

The court concludes that Witness-1's statements are not tainted under the attenuation and inevitable discovery doctrines. The Government contends that Witness-1's statements are not tainted under the independent source or the attenuation doctrine because the "statements had been made independently of the HSI agent's review of the defendant's devices and prior to the co-conspirator's knowledge of the seizure of the defendant's devices." (Gov't Mot. at 24.) Fox opposes the Government's motion, arguing that "[b]oth Witness-1's testimony and the communications the Government seeks to admit through Witness-1 should be precluded as insufficiently attenuated from the illegal searches" of her devices. (Fox's Opp. at 5.) Specifically, Fox adds that Witness-1 became a cooperator in this investigation only because of Agent Shapiro's illegal search of her devices. (*Id.*) In its reply, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

33

███████████████████████████████

As the court discussed above, *see supra* Part III.A.2.a, the Supreme Court in *Nardone* explained that "[a]s a matter of good sense," where "a causal connection between information obtained through illicit [search] and the Government's proof," is attenuated, such remoteness "dissipate[s] the taint" of the initial violation. 308 U.S. at 341. In *United States v. Ceccolini*, the Court elaborated on the attenuation doctrine as it applies to live-witness testimony. 435 U.S. 268, 273, 276-79 (1978) (holding "that the Court of Appeals was wrong in concluding that there was insufficient attenuation between" the police officer's illegal search and the witness's testimony at trial). There, it introduced a four-factor test, without assigning any "mathematical weight . . . to any of the factors," for determining when the cooperation of a witness is unaffected by an illicit search. *Id.* at 280. The factors include (i) "the stated willingness of the witness to testify"; (ii) "the role played by the illegally seized evidence in gaining his cooperation"; (iii) "the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial"; and (iv) "the police motivation in conducting the search." *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980) (stating that "where cooperation is not induced by the police misconduct, testimony will be received notwithstanding that the unreasonable intrusion was one step in the series of events which led to the witness' testifying"). The third factor weighs in favor of attenuation where "[s]ubstantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other." *Ceccolini*, 435 U.S. at 279.

First, Witness-1 initially approached law enforcement in Virginia for reasons completely unrelated to this case. ██████████████



This is further confirmed by Witness-1's attorney's statements made during Witness-1's revocation of supervised release hearing in the United States District Court for the Eastern District of Virginia. (*See United States v. Cross*, No. 17-CR-118 (ALW) (E.D. Va. May 2, 2024), Revocation of Supervised Release Hr'g Tr. (Dkt. 189) 18:7-14 (counsel stating that Witness-1 "voluntarily walk[ed] into the government's offices" and "me[t] with them without counsel," in part because she wanted "to protect her family").)

Thus, the court finds that Witness-1 was "act[ing] of her own free will [and was] in no way coerced or even induced by official authority"; instead, Witness-1 offered her testimony for reasons wholly unconnected to the Government's illegal seizure of Fox's devices. *Ceccolini*, 435 U.S. at 279.

Fox argues that "[t]o cooperate because one is facing indictment, in order to obtain leniency at sentencing, is not a compelling exercise of free will." (Fox's Opp. at 5.) In support of this argument, Fox relies on *United States v. Ghailani*, in which the court found that the witness's decision to cooperate was "not a free and unconstrained decision" because "[h]e never would have come forward on his own." 743 F. Supp. 2d at 279. But that is exactly what distinguishes Witness-1 from the witness in *Ghailani*—willingness to come forward on her own. To clarify, the witness in *Ghailani* "knew very soon after the bombings that he had sold explosives to a man wanted in connection with those bombings," and for *eight years* did not disclose this information to anyone. *Id.* He eventually confessed after "he was taken off the street in Arusha," a city in Tanzania, "flown to an unknown location in Zanzibar, held *incommunicado* and questioned for a week, and then lo[c]ked up in Dar es Salaam for another five days." *Id.* It took Witness-1 only *three days* after her then-husband's arrest to voluntarily approach law enforcement. And unlike the witness in *Ghailani*, whose freedom of movement was completely restrained, she was free to leave the interview anytime. Judge Lewis Kaplan recognized in *Ghailani* that his conclusion "is not to say that only eager volunteers and dutiful, uninvolved citizens may qualify as willing witnesses or that those who cooperate to improve their prospects in the criminal justice system may not be so regarded." *Id.* at 281. Witness-1's decision to cooperate in part because she wanted to improve her family's and her own prospects certainly does not override her willingness to testify.

Moreover, *Ceccolini* does not require the court to find that the witness came forward to testify completely free of any outside factors. Instead, it says that "[t]he greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." *Ceccolini*, 435 U.S. at 276-77 (emphasizing that "the

degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence"). Witness-1 was willing to testify to protect her family. *See United States v. Reyes*, 157 F.3d 949, 954 (2d Cir. 1998) (holding that the witness's regret for what he had done and desire "to do the right thing for [himself] and [his] family . . . supports the conclusion that [his] cooperation was truly the product of his free will, unaffected by the illicit search"). Her willingness left law enforcement with fewer incentives to conduct an illegal search to discover her. Indeed, as the court's below analysis of the inevitable discovery doctrine shows, it was only a matter of time before law enforcement would reach Witness-1 in its investigation. For these reasons, the court finds that the first *Ceccolini* factor weighs in favor of the Government.

Second, in evaluating "the role played by the illegally seized evidence in gaining [Witness-1's] cooperation," *see Leonardi*, 623 F.2d at 752, the court first notes that the Government did not confront Witness-1 with the illegally obtained evidence to secure her cooperation;

▮▮▮▮▮ Nor did the Government induce her cooperation "as a result of the evidence illegally obtained from" Fox, *see Ghailani*, 743 F. Supp. 2d at 282, ▮▮▮▮▮

▮▮▮▮▮ Put differently, on November 18, 2021, when Witness-1 first went to the FBI field office, she had already decided to offer her cooperation. Fox's contention that Witness-1 "was only brought into this case because of the illegal searches" does not change the outcome because the relevant inquiry here is not whether the illegal search linked Witness-1 to Fox; it is whether the illegal search induced Witness-1's cooperation. *Reyes*, 157 F.3d at 955 (finding no plain error in admitting

the cooperating witness's testimony "even though [the witness] was tracked down with the aid of the illegally seized telephone number and even if the agents would not have located him by means of their preexisting knowledge"). And the court already explained that such inducement is not present here. Thus, this factor also weighs in favor of the Government.

Third, it is true that Witness-1 offered her cooperation to law enforcement only two days after the illegal search of Fox's devices. But the court finds that the proximity between the two events does not necessarily cut against the Government's position because of a third intervening act—Witness-1's then-husband's arrest—that took place three days before Witness-1 went to the FBI field office. For the reasons discussed above, the court finds that Witness-1 was willing to testify to protect her family. Therefore, the proximity of the illegal search to Witness-1's decision to cooperate does not carry much weight. Furthermore, Witness-1 has had *more than three years* to evaluate her decision to cooperate and testify at Fox's trial. *See Reyes*, 157 F.3d at 955 ("In light of . . . the two-and-a-half month lapse between the illegal behavior and [the witness's] decision to cooperate, the connection between the illegal search and the testimony is sufficiently attenuated.")

As such, because the court finds that a significant amount of time "elapsed between . . . the initial contact with the witness . . . and the [anticipated] testimony at trial," this factor also weighs in favor of the Government. *Ceccolini*, 435 U.S. at 279.

Finally, the court agrees with Fox that the fourth *Ceccolini* factor supports excluding Witness-1's statements. When suppressing the illegally seized evidence from Fox's devices, this court reasoned that "it is necessary to deter future Fourth Amendment violations and that the deterrence value outweighs the cost of suppression of relevant evidence." *Fox*, 2024 WL 3520767, at

*19. In reaching its conclusion, the court "f[ound] that Agent Shapiro's conduct exhibited at least a reckless or grossly negligent disregard" of Fox's Fourth Amendment rights. *Id.* at *20. Specifically, the court emphasized Special Agent Shapiro's "deliberate, tactical choice to evade the warrant requirement that would otherwise apply to search of the contents of Defendant Fox's cellphone." *Id.* Because these considerations remain relevant, the law enforcement "motivation in conducting the search" necessitates upholding the deterrent value of this court's earlier decision. *Leonardi*, 623 F.2d at 752. As such, the last *Ceccolini* factor weighs in favor of Fox.

*Ceccolini*'s four-factor test does not assign special weight to any of the factors. The Government has met its burden of showing attenuation as to three of the four *Ceccolini* factors. Therefore, the court finds that "the connection between the lawless conduct . . . and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." *Ceccolini*, 435 U.S. at 273-74. To that end, the court will not suppress Witness-1's statements at trial.

Alternatively, the court finds that the inevitable discovery doctrine also provides an exception to the exclusionary rule with respect to Witness-1's statements. First the court's analysis above, *see supra* Part III.A.2.a, already set forth the reasons for finding that the Government's investigation was in progress before the illegal search, *see Eng I*, 971 F.2d at 861 ("[I]nevitable discovery analysis logically must begin with the progress of the investigation at the time of the government misconduct.").

The court need not take the Government's word for it. It appears that Special Agent Bailey, of the FBI, and

Special Agent Shapiro, of HSI, communicated regarding their respective investigations as early as January 2022. (*See generally* Email Chain (Dkt. 150-1).) The exchange between the agents demonstrates that the Government's investigation was "well-defined," and that the Government's "effort [was] planned and methodical." *Eng I*, 971 F.2d at 859. It was only a matter of time before law enforcement linked the two cases to each other. In sum, the court concludes that pursuant to the attenuation and inevitable discovery doctrines, Witness-1's statements are not tainted.[12]

### b. *Admissibility Pursuant to the Rules of Evidence*

Pursuant to FRE 801(d)(2)(E), the court grants the Government's motion *in limine* to provisionally admit the relevant statements made by Witness-1 and others regarding the identities and records concerning certain charged and uncharged coconspirators.

Rule 801(d)(2)(E) of the Rules of Evidence provides that when the proponent offers a statement against an opposing party that "was made by the party's coconspirator during and in furtherance of the conspiracy," such statement is not hearsay. Fed. R. Evid. 801(d)(2)(E). Although "[t]he statement must be considered," it "does not by itself establish . . . the existence of the conspiracy or participation in it." *Id.*; *see also United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994) ("To admit a coconspirator's statement

---

[12] Based on the Government's submission, the court cannot determine whether it was Special Agent Bailey or Shapiro that contacted the other one first. The distinction is a key determination under the independent source doctrine: if it was Special Agent Shapiro—who by January 2022 had already accessed the illegally seized devices—the Government may not be able to meet its burden of showing that the "information gleaned from the illegal conduct" did not lead to Witness-1's discovery and eventual connection to this case. *See Johnson*, 994 F.2d at 987. The court need not decide the issue, however, because it has already found two independent grounds based on which Witness-1's statements are not tainted.

under Rule 801(d)(2)(E), the trial court must first find by a preponderance of the evidence that the statement was made by a coconspirator of the defendant during the course of the conspiracy and in furtherance of it.").

Under the Second Circuit's *Geaney* rule, "statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" of FRE 801(d)(2)(E)'s "four prerequisites." *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969)). The prerequisites are that: (i) a conspiracy existed; (ii) the defendant and declarant were members of that conspiracy, (iii) the statements were made during the course of the conspiracy; and (iv) the statements were made in furtherance of the conspiracy. *Id.* (noting that the burden of proof is a preponderance of the evidence). Although the rule "requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013). And "[w]hen the government has persuaded the judge that the prerequisites for admission of coconspirator statements have been established, the judge should make his *Geaney* findings outside the presence of the jury, and the jury should not be told what facts the judge believes have been established." *Tracy*, 12 F.3d at 1200. At the motion *in limine* stage, courts within the Second Circuit typically make general rulings of admissibility with respect to categories of co-conspirator statements while leaving room for objections to specific statements during trial. *See, e.g., United States v. Htut*, No. 22-CR-671 (NSR), 2023 WL 4399049, at *14 (S.D.N.Y. July 7, 2023) (rejecting the defendant's objection to the government's offering of co-conspirator statements *en masse*); *see also United States v. Adelekan*, 567 F. Supp. 3d 459, 468 (S.D.N.Y. 2021) (finding that

certain categories of statements are likely admissible as co-con-
spirator statements).

The Government submits that "[t]he evidence at trial will estab-
lish by a preponderance that these co-conspirators were in fact
part of the conspiracy." (Gov't Mot. at 19.) Specifically, the Gov-
ernment "expects to prove at trial that the defendant was a
member of the wire fraud conspiracy alleged in the indictment,"
and "to show that Witness-1 participated in the fraud in exchange
for illegal kickbacks to help facilitate the fraudulent loan applica-
tions." (*Id.* at 20.) To that end, the Government seeks "to
introduce, through Witness-1, one or more communications be-
tween the defendant and the co-conspirator that were shared
with the government during a proffer session with the co-con-
spirator." (*Id.* at 21.) Similarly, the Government also requests to
admit "the identities and records pertaining to Fox's uncharged
co-conspirators." (*Id.*) Fox does not appear to contest that there
was a conspiracy. Nevertheless, she asks that "until the govern-
ment specifically identifies" the unidentified out-of-court
statements by unspecified individuals, this court should reserve
decision on this motion. (Fox's Opp. at 4.)

But the *Geaney* rule allows this court to conditionally admit the
statements subject to Fox's evidentiary challenges at trial. *See
United States v. Russo*, 483 F. Supp. 2d 301, 310 (S.D.N.Y. 2007)
(rejecting the "[d]efendants' request that the government iden-
tify all [the co-conspirator] statements and the circumstances of
their evidence" in part because there is "no reason why the nor-
mal process of disclosure through the ordinary course of
discovery, . . . and objections during the course of trial, are inad-
equate in th[e] case"). Where "[t]he Government has already
provided substantial discovery to Defendant, including . . . the
names of the co-conspirators and aiders and abettors," the court
will deny the defendant's request for "identification of the specific
coconspirators' statements and a written explanation of the basis

for admitting the statements in furtherance of the conspiracy." *United States v. Baldeo*, No. 13-CR-125 (PAC), 2014 WL 351601, at *1 (S.D.N.Y. Jan. 31, 2014). ██████████████

██████████████████████████████████████████

██████████████████████████ Furthermore, the Government has produced batches of documents to Fox over the course of this case since July 21, 2023. (*See* Gov't Discovery Letter Dated 6/3/2025 (Dkt. 159) at 3.) Therefore, the court admits the statements referenced herein into evidence as co-conspirator statements under FRE 801(d)(2)(E) "on a conditional basis, subject to the later submission of the necessary evidence" as required pursuant to the same rule. *Tracy*, 12 F.3d at 1199; *see also Geaney*, 417 F.2d at 1120 (holding that in a conspiracy case, the "judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances"). Because the court admits these statements into evidence conditionally, the Government may not refer to them in its opening statement.

4.   Suppressed Evidence as Impeachment Evidence

Next, the Government seeks to introduce suppressed evidence and any fruits of the illegal search as impeachment evidence "on direct or cross-examination at trial," should Fox decide to testify "about her involvement in the scheme." (Gov't Mot. at 37.) Fox asks that the court reserve decision on this issue, presumably because it is unclear whether Fox will testify or not. (*See* Fox's Opp. at 12.)

A long line of Supreme Court and Second Circuit precedents establish that the proponent may rely on suppressed evidence for impeachment where the witness opens to door to such questioning. *See, e.g., James v. Illinois*, 493 U.S. 307, 308-09 (1990) ("The

impeachment exception to the exclusionary rule permits the prosecution in a criminal proceeding to introduce illegally obtained evidence to impeach the defendant's own testimony"); *United States v. Jaswal*, 47 F.3d 539, 543-44 (2d Cir. 1995) ("Indeed, the government points out that even illegally obtained and suppressed evidence may properly be used on cross-examination to impeach subsequent inconsistent testimony." (citing *United States v. Havens*, 446 U.S. 620, 629 (1980))). However, it is currently unclear whether Fox will testify at her trial or not. Nor is it clear what her testimony would entail should she choose to testify. As such, the court reserves its decision "until trial, so that the motion is placed in the appropriate factual context." *Ohio Cas. Ins. Co.*, 2019 WL 1365752, at *2; *see also United States v. Mendlowitz*, No. 17-CR-248 (VSB), 2019 WL 6977120, at *1 (S.D.N.Y. Dec. 20, 2019) (explaining that it was "premature to give a ruling without having heard, first of all, what testimony comes in through the witnesses that are going to take the stand concerning what is done").

### 5. EIDL Program Application as Prior Act Evidence

The Government next moves *in limine* to introduce the paperwork of Fox's loan applications for the EIDL. (Gov't Mot. at 38-39.) The Government argues that Fox, "through her company Credit Benders[,] . . . fraudulently applied for EIDL funding on June 19, 2020, and, ten days later, received $17,000 in EIDL funding—with a $2,000 EIDL Advance associated with the approved loan." (*Id.* at 39.) The Government seeks to introduce these documents as "evidence of lack of mistake, evidence of [Fox's] association with Credit Benders, and additional evidence of the direct conspiracy here, as the evidence at trial will show that [Fox] and her co-conspirators fraudulently prepared both

44

PPP and EIDL applications to defraud the SBA." (*Id.*)[13] Fox op-
poses the motion, arguing that "[t]here is no indication that the
information in th[e] [EIDL] application is false or that the loan
was fraudulently received." (Fox's Opp. at 13.) To that end, Fox
adds that "absent a pretrial proffer of proof that [the application]
is fraudulent," the Government cannot admit these documents as
either direct evidence of the conspiracy or to show lack of mis-
take, knowledge, or intent pursuant to FRE 404(b)(2). (*Id.*)

Rule of Evidence 404(b)(1) prohibits admission of "[e]vidence of
any other crime, wrong, or act . . . to prove a person's character
in order to show that on a particular occasion the person acted
in accordance with the character." Fed. R. Evid. 404(b)(1). How-
ever, as relevant here, such "evidence may be admissible for
another purpose," such as proving intent, knowledge, or absence
of mistake. Fed. R. Evid. 404(b)(2). The Second Circuit "follows
the 'inclusionary' approach, which admits all 'other act' evidence
that does not serve the sole purpose of showing the defendant's
bad character[.]" *United States v. Curley*, 639 F.3d 50, 56 (2d Cir.
2011). Even then, "the probative value of this relevant purpose
[must] not [be] substantially outweighed by any unfair preju-
dice" under FRE 403. *United States v. Paulino*, 445 F.3d 211, 221
(2d Cir. 2006); Fed. R. Evid. 403 ("The court may exclude rele-
vant evidence if its probative value is substantially outweighed
by a danger of . . . unfair prejudice, confusing the issues, [or]
misleading the jury[.]"). To that end, courts can exclude evi-
dence of other acts for being unfairly prejudicial if they "involve
conduct more inflammatory than the charged crime." *United
States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (finding no
abuse of discretion where the district court admitted the defend-
ant's prior violent act that "was relevant to rebut [the

---

[13] The Government avers that the EIDL-related "documents and infor-
mation were obtained through HSI requests to the SBA made prior to the
device searches." (Gov't Mot. at 39.) Fox does not appear to contest this.

defendant's] assertion that he choked [the victim] unintention-
ally"). Moreover, "[f]or uncharged crime evidence to be
probative of knowledge and intent, the government must identify
a similarity or connection between the two acts." *Paulino*, 445
F.3d at 223. Although "as a general rule, the offer of evidence to
prove the defendant's intent or knowledge should await the con-
clusion of the defendant's case[,]" such evidence "may be
introduced during the government's case-in-chief," if "it is appar-
ent that intent will be in dispute[.]" *United States v. Pitre*, 960
F.2d 1112, 1120 (2d Cir. 1992).

As a preliminary matter, the Government may not introduce
Fox's EIDL loan application and documents related to such appli-
cation as direct evidence of acts committed in furtherance of the
conspiracy scheme charged in the Indictment. The Indictment
here charged the Defendants, including Fox, with "knowingly
and intentionally conspir[ing] to devise a scheme and artifice to
defraud the SBA, and to obtain money and property from the
SBA." (Indictment ¶ 22.) But in describing the relevant "fraudu-
lent scheme," it only alleged that Defendants "orchestrated a
scheme to submit fraudulent *PPP loan applications* on behalf of
borrowers who did not legitimately qualify for loans under the
*PPP program*, in exchange for 'commissions' taken from the loan
proceeds." (*Id.* ¶ 11 (emphases added).) Although the Indictment
devoted ten paragraphs to breaking down the "fraudulent
scheme," it never mentioned any loan applications for the EIDL.
(*Id.* ¶¶ 11-20.) Now, the Government attempts to rewrite the In-
dictment without filing a superseding indictment by alleging that
the EIDL paperwork constitutes "additional evidence of the direct
conspiracy here." (Gov't Mot. at 39.) But the allegations relevant
to the conspiracy here—as set forth in the Indictment by *the Gov-
ernment*—concern the PPP loans, not the EIDL.

The Government cites *United States v. Diaz*, in which the Second
Circuit affirmed the district court's decision to admit prior "bad

acts [evidence] as 'background evidence' to show that the defendants-appellants constituted a RICO enterprise." 176 F.3d 52, 79 (2d Cir. 1999). But the court in *Diaz* reasoned that the admitted evidence, namely, the testimony about drug dealing, "informed the jury how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators." *Id.* at 79-80 (noting that the trial court has discretion to admit bad acts evidence "to inform the jury of the background of the conspiracy charged, . . . to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators"). Other than making a blanket statement that "the evidence at trial will show that [Fox] and her co-conspirators fraudulently prepared both PPP and EIDL applications to defraud the SBA[,]" the Government does not explain specifically how this evidence serves any of the purposes for admitting prior bad acts evidence as discussed in *Diaz*. (Gov't Mot. at 39.) Thus, the EIDL materials are not admissible as direct evidence of the conspiracy charged in this case.

The Government may nevertheless introduce the EIDL documents for the limited purpose of showing intent, knowledge, or absence of mistake. The court acknowledges that this is a Wire Fraud Conspiracy case, which will require that the Government prove—beyond a reasonable doubt—Fox's "inten[t] to devise any scheme or artifice to defraud." *See* 18 U.S.C. § 1343; *see also United States v. Greenberg*, 835 F.3d 295, 305-06 (2d Cir. 2016) (acknowledging that "the wire fraud statute . . . demands a showing that the defendant possessed a fraudulent intent"). Fox also acknowledges that intent will be an essential component of the Government's case in chief. (Fox's Opp. at 14 (stating that "knowledge that fraud was being committed and her intent to cause actual injury are elements the government has to prove").) The Government may rely on the EIDL documents to weaken any argument by Fox that she lacked intent or knowledge, or that she

made a mistake. This evidence is especially "probative of knowledge and intent," because there is "a similarity or connection between" Fox's EIDL and PPP loan applications. *Paulino*, 445 F.3d at 223. Both the PPP and the EIDL programs were sources of relief, established by the SBA as part of the CARES Act, to provide financial assistance to small businesses experiencing hardships because of the COVID-19 pandemic. (Gov't Mot. at 3, 38-39.) As such, because "it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief, rather than waiting until the conclusion of the defendant's case." *Pitre*, 960 F.2d at 1120.

The court also finds that any evidence of EIDL fraud does not "involve conduct more inflammatory than the charged crime." *Livoti*, 196 F.3d at 326. To the contrary, the Government describes the EIDL loan scheme as similar to the PPP loan scheme, involving a much smaller amount: "$17,000 in EIDL funding— with a $2,000 EIDL Advance associated with the approved loan." (*Compare* Gov't Mot. at 39, *with*, *id.* at 4 (claiming that Fox "orchestrated a scheme to prepare and submit fraudulent applications for COVID-19 relief worth millions of dollars").) Therefore, the probative value of this evidence is not substantially outweighed by a danger of unfair prejudice to Fox. Fed. R. Evid. 403. Fox's argument that these materials cannot be admitted for any purpose at all because "[t]here is no indication that the information in th[e] application is false or that the [EIDL] loan was fraudulently received" goes to the weight, not the admissibility of this evidence. (Fox's Opp. at 13.) Accordingly, the court grants the Government's motion *in limine* to introduce the paperwork of Fox's EIDL loan applications for the limited purpose of showing intent, knowledge, or lack of mistake. The court will provide a limiting instruction if so requested. *See* Fed. R. Evid. 105.

6.    Questioning About Illegal Search of Fox's Devices

The Government requests that the court preclude Fox from referencing or making arguments about the lawfulness or unlawfulness of the illegal search of her devices. (Gov't Mot. at 41.) That line of questioning, according to the Government, would be both irrelevant under FRE 401, and prejudicial under FRE 403. (*Id.*) Relatedly, the Government also moves to preclude Fox "from making arguments about the absence of any evidence from [her] electronic devices or related e-mail accounts" that were seized as part of the illegal search. (*Id.* at 42.) For her part, Fox's counsel indicates that she "has no intention of asking questions of witnesses or making jury arguments about the illegal searches" as long as the court "rules prior to trial on what is a fruit and what is not[.]" (Fox's Opp. at 13.) Nevertheless, Fox asks that her counsel "be permitted, pursuant to" FRE 608(b) "and the Confrontation Clause of the Sixth Amendment, to cross-examine" Special Agent Shapiro, should the Government call him to testify. (*Id.*) The Government states in its reply that it "does not intent to offer Special Agent Shapiro as a witness at trial." (Gov't Reply at 19.)

As the court decided above, *see supra* Part III.A.1, it has and will address taint-related arguments before trial. Therefore, because Fox does not intend to ask any questions about the illegal searches, and the Government does not intend to call Special Agent Shapiro as a witness during trial, there is no live dispute between the parties with respect to this issue. To that end, the court denies the Government's motion *in limine* to preclude Fox from referencing the illegal search as moot without prejudice to renewal should Fox retreat from her current position of not making any references to or arguments about the illegal search.

7.    Prosecution Elsewhere

Next, the Government asks the court to preclude Fox from arguing that "the case would have been better brought elsewhere"

because Fox resided in Georgia and Nevada during the relevant time period. (Gov't Mot. at 43.) Fox responds that she "has no intention of making improper argument about where a federal case can be legally prosecuted" if the Government can meet its burden of proving that venue is proper in the Eastern District of New York ("EDNY"). (Fox's Opp. at 14.)[14] Again, because there does not appear to be a live dispute between the parties here, the court denies the Government's motion *in limine* without prejudice. The Government may renew its motion if Fox argues that this case should have been brought elsewhere, as opposed to arguing that the Government has not met its burden of establishing venue in the EDNY.

8. Punishment, Prior Good Acts, Lack of Prior Bad Acts, and Uncharged Defendants

The Government also argues that the court should preclude "evidence and argument" on the following topics that "would be improper or so irrelevant that any probative value would be swamped by the attendant risks of confusion, [being] misleading, delay, and waste of time": (1) "any potential punishment or consequences that [Fox] faces if convicted of the charged offenses"; (2) "[Fox's] personal background or other facts designed to engender juror sympathy"; and (3) Fox's "prior commission of any alleged 'good acts.'" (Gov't Mot. at 44-45.) Fox agrees that irrelevant evidence is inadmissible and states that she "does not plan to pursue jury nullification." (Fox's Opp. at 14.) However, Fox also notes that, to the extent her lack of criminal history "may bear on [her] knowledge and intent," such evidence "should not be categorically excluded." (*Id.*) The Government reiterates its

---

[14] "The Government bears the burden of proving venue by a preponderance of the evidence." *See United States v. Hoskins*, 44 F.4th 140, 157 (2d Cir. 2022). But venue "may lie in more than one place if the acts constituting the crime and the nature of the crime charged implicate more than one location." *Id.*

position that "the lack of similar or dissimilar bad acts or criminal history are inadmissible," and emphasizes that Fox does not offer any authority in support of her position. (Gov't Reply at 19.)

As an initial matter, because Fox concedes that she "does not plan to pursue jury nullification," (Fox's Opp. at 14), the court does not find a live dispute concerning the Government's argument that Fox should be precluded from offering any evidence or making any arguments "designed to engender juror sympathy," (Gov't Mot. at 45.) Similarly, Fox apparently agrees that she may not make any references to possible consequences of her potential guilty verdict. (*See* Fox's Opp. at 14.) Regardless, out of an abundance of caution, the court emphasizes that "[s]tatements designed to appeal to the jury's emotions or to inflame the passions or prejudices of the jury are improper." *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) (collecting cases); *see also United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding the defendant from "advanc[ing] arguments aimed at jury nullification"). Likewise, it is well established that prosecutors "should not use arguments calculated to inflame the passions or prejudices of the jury." *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981). And it is also "well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("The principles that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury."); *see also United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences."). This is clearly not a capital trial which means that the jury has no role to play in sentencing. Thus, because these issues are not ripe for resolution, the court denies the Government's motion without prejudice to renewal should Fox make any arguments or offer

any evidence aimed at jury nullification or discussion of potential consequences of her conviction.

That leaves the court with the Government's argument that Fox should not be allowed to offer any evidence in support of or make any references concerning her prior good acts. As noted above, "[e]vidence of any other . . . act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1); *see also United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) (explaining that "a defendant may not seek to establish his innocence through proof of the absences of criminal acts on specific occasions"). However, such evidence "may be admissible for another purpose, such as proving . . . intent[.]" Fed. R. Evid. 404(b)(2); *see also DeJesus v. United States*, No. 6-CR-12 (WHP), 2017 WL 6343678, at *6 (S.D.N.Y. Dec. 11, 2017) (concluding that "[k]nowledge and intent were disputed issues . . . at trial" and "[e]vidence of . . . prior narcotics sales were relevant to rebut th[e] suggestions" that the petitioner-defendant "was merely present at the place where narcotics sales were conducted").

Fox does not appear to plan to introduce any evidence of her past good acts such as charitable work, entrepreneurial work, philanthropy, or religious participation to establish that she must have acted in conformity with those acts in this instance. (*See* Fox's Opp. at 14.) And when granting the Government's motion *in limine* to introduce the paperwork of Fox's EIDL applications for the limited purpose of showing intent, knowledge, or lack of mistake, the court already noted that Fox's intent and knowledge will be at issue during trial. *See supra* Part III.A.5. It is for those exact same reasons that the court denies the Government's motion to preclude Fox from introducing evidence of or making references to her lack of criminal history or other specific acts, insofar as Fox does so for the limited purpose of disproving

knowledge or intent. *See DeJesus*, 2017 WL 6343678, at *6 ("Rule 404 allows evidence of . . . other act[s] to be admitted for certain specified purposes including 'intent' and 'knowledge.'" (citing Fed. R. Evid. 404(b)(2))). Thus, the Government's motion *in limine* is denied without prejudice to renewal if Fox attempts to make references to her prior good acts for propensity reasons.

### 9. Alleged Negligence or Lack of Reliance by PPP Lenders or the SBA

The Government also asks the court to preclude evidence or argument regarding the SBA or PPP lenders' negligence or failure to detect the fraud. (Gov't Mot. at 46-47.) Additionally, the Government argues that it need not prove that the victims of the fraud were actually injured, because "reliance is not an element of the federal fraud statutes." (*Id.* at 48.) Fox agrees that it is improper for her to argue "victim negligence" as a defense, "and that actual injury is not required." (Fox's Opp. at 14.) Nevertheless, she maintains that "[t]o the extent the PPP Lenders at issue in this case . . . provided misleading information about the criteria for the loans, or contacted potential borrowers directly to upload their documents," such evidence "would clearly be relevant to Ms. Fox's knowledge and intent." (*Id.*)

In general, "[a] defendant charged with a fraudulent scheme may not assert the victim's negligent failure to discover the fraud as a defense." *United States v. James*, 607 F. Supp. 3d 246, 255 (E.D.N.Y. 2022) (citing *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004)). It logically follows then that, "just as fortuitous choice of a gullible victim does not negate a defendant's fraudulent intent, it does not negate the materiality of a defendant's misrepresentations" either. *United States v. Denkberg*, 139 F.4th 147, 163 (2d Cir. 2025). Like in *James*, the court here "cannot envision a scenario which renders Defendant's argument"— that any misleading information provided by the SBA or the PPP lenders or the fact that they contacted the potential borrowers is

relevant to her knowledge and intent—"as anything other than a defense that the [SBA or the PPP lenders] were negligent in failing to discover the alleged fraud." 607 F. Supp. 3d at 255 (rejecting the argument as "a repackaged version of an impermissible victim-blaming defense"). Although Fox had an opportunity to discuss the issue in her submission, the Government correctly asserts that she "fail[ed] to explain how" the PPP lenders or the SBA may have acted negligently such that her intent or knowledge would be at issue. (Gov't Reply at 20.) At trial, Fox may advance a theory to support her argument and convince this court otherwise "[b]ecause a ruling on a motion *in limine* is subject to change as the case unfolds." *Perez,* 2011 WL 1431985, at *1. Having failed to do so here, the court makes "a preliminary determination in preparation for trial," *id.*, and grants the Government's motion *in limine* to preclude Fox from arguing that the PPP lenders or the SBA's failure to detect the alleged fraud or the notion that they provided any misleading information on their forms is relevant to Fox's knowledge and intent.

### 10.  Widespread Nature of PPP Fraud

The Government additionally requests that the court preclude Fox "from making arguments that PPP fraud was widespread during the relevant timeframe" because it "would risk confusing the jury and invite the jury to nullify on the ground that it is unfair that the defendant is being prosecuted." (Gov't Mot. at 48-49.) Relatedly, the Government also asks the court to preclude Fox "from offering argument related to the government's charging decisions in this case or in related PPP fraud cases." (*Id.* at 50.) Because Fox "does not intend to argue this," (Fox's Opp. at 14), the court denies the Government's motion without prejudice to renewal should Fox retreat from her current position.

### 11.  Agent Reports

Next, the Government moves *in limine* to preclude Fox "from introducing the contents of any law enforcement reports or notes

provided as Jencks Act or Rule 26.2[15] material to impeach such witnesses during cross-examination, publishing the contents of such reports or notes to the jury, or otherwise suggesting to the jury that the reports or notes are statements of the witnesses who did not write or adopt them." (Gov't Mot. at 50-51.) There does not appear to be a live controversy regarding this issue. (*See* Fox's Opp. at 15 (noting that "[t]he defense is well aware of the Rules of Evidence governing impeachment and, if necessary, will call the relevant law enforcement agents as witnesses to complete its impeachment").) As such, the court denies the Government's motion without prejudice to renewal should Fox attempt to improperly use law enforcement reports of witness interviews for impeachment at trial.

### 12. Trial Exhibits and Witness Statements

Lastly, the Government (i) requests that Fox "produce any defense discovery materials and defense exhibits . . . one week before the start of trial"; and (ii) "proposes that Rule 26.2 material for defense witnesses should be provided no later than two days before the witness testifies." (Gov't Mot. at 55; Gov't Reply at 21.)[16] As the Government notes in its reply brief, "there is general agreement" between the parties as to the aforementioned timeline. (Gov't Reply at 21; *see also* Fox's Opp. at 15 (agreeing with the timeline but reserving the right to make last-minute, strategic decisions).) Thus, the court grants the Government's

---

[15] The Jencks Act, codified as 18 U.S.C. § 3500, and Federal Rule of Criminal Procedure 26.2 "require the government to turn over witness statements to the defendant if certain conditions are met." *United States v. Artis*, 523 F. App'x 98, 100-01 (2d Cir. 2013) (summary order) (discussing the relevant requirements).

[16] The Government asked that defense discovery materials and exhibits be produced by June 23, 2025, a week before the scheduled start of the trial at the time these motions were filed. Since then, the court has granted Fox's request to move the trial to November 3, 2025. (*See* Text Order Dated 6/12/2025.)

motion *in limine*: Fox is directed to produce (i) any defense discovery materials and defense exhibits by October 27, 2025; and (ii) material pursuant to Federal Rule of Criminal Procedure 26.2 for defense witnesses no later than two days before a given witness's testimony.

### B.  DEFENDANT FOX'S MOTIONS

Fox moves *in limine* to exclude (1) evidence that the Government has not shown it obtained independently of (a) the illegal manual search of Fox's phone and (b) the subsequent violation of Fox's Fourth Amendment rights when Special Agent Shapiro unreasonably delayed seeking a warrant application for the forensic search of Fox's phone and laptop, and omitted critical details in his affidavit supporting the same warrant; (2) testimony that certain co-conspirators of the alleged scheme were employed by Delta or at LGA; (3) evidence or argument that taxpayers funded the PPP loan or the EIDL program; and (4) any Rule 16 materials that the Government had in its possession but did not disclose as of May 7, 2025—the date of the filing of the motions *in limine*. (*See* Fox's Mot. at 1.)[17] The court addresses each motion in turn below.

#### 1.  Fruits of the Suppressed Evidence

First, Fox argues the Government should be precluded from introducing any evidence, including witness testimony, that it became aware of after the illegal search of Fox's devices on November 16, 2021, unless the Government can demonstrate that it obtained such evidence independently of (a) the illegal search and seizure, and (2) the search warrant that the Government obtained based on an affidavit that relied on information obtained from the illegal search. (Fox's Mot. at 2.) To that end, Fox "flags

---

[17] As noted above, the court will issue a separate decision on the Government's and Fox's competing motions *in limine* concerning Fox's post-arrest statements.

certain buckets of evidence that appear to be fruits" of the Government's Fourth Amendment violations: (i) statements of Fox disclosed to the Government by co-defendants; (ii) lay witnesses who will identify Fox as a participant in the alleged scheme; (iii) certain financial records; and (iv) e-mail returns.[18] (*Id.* at 2-6.)

As to the first bucket of evidence, the parties agree that the relevant statements concern certain text messages and emails between Fox and Witness-1. (*See* Fox's Mot. at 4; Sealed Gov't Opp. (Dkt. 141) at 2-11.) Fox argues that HSI was not aware of Witness-1 before the illegal search of Fox's devices and thus, "would not have questioned . . . , arrested . . . or obtained these documents" from Witness-1 otherwise. (Fox's Mot. at 4.) Therefore, she claims that "any texts or emails (or other information) disclosed" by Witness-1 constitute fruits of the illegal search. (*Id.*)

Fox does not address this issue in her reply brief, apparently relying on her arguments submitted as part of her opposition brief that addresses the Government's motion *in limine* to admit Witness-1's statements into evidence.

In addressing the Government's motions *in limine*, the court already concluded that Witness-1's statements are not tainted pursuant to the attenuation and inevitable discovery doctrines. *See supra* Part III.A.3.a. That reasoning equally applies to documents, including text messages and emails, provided by Witness-

---

[18] Fox also includes her post-arrest statements on this list. (Fox's Mot. at 6-7.) As stated above, the court will address those statements in a separate decision.

1 to the Government as part of her cooperation. To conclude otherwise "would . . . put the government in a worse position, because [law enforcement] would have obtained that evidence if no misconduct had taken place." *Nix*, 467 U.S. at 444. To that end, this court concludes that records, including text messages and emails, provided by Witness-1 to the Government do not constitute fruits of Special Agent Shapiro's illegal search of Fox's devices.

As to the second bucket of evidence, Fox requests that "[t]o the extent the government intends to call . . . other witnesses who were identified by law enforcement based on the illegal searches of [her] phone and laptop, such testimony should be excluded as a fruit of the illegal searches." (Fox's Mot. at 4.) Other than Witness-1 and the second witness further discussed in the parties' briefs regarding the Government's supplemental motion filed under seal, as of now, the Government does not appear to plan on calling any other witness who may have been identified through the illegal searches of Fox's devices.[19] (*See* Gov't Suppl. Mot. (Dkt 140).) As such, Fox's request is not ripe for resolution.

The third bucket of evidence that purportedly constitutes fruits of illegal search includes certain Block and Zelle[20] financial records. (Fox's Mot. at 5.)[21] Fox emphasizes that "[t]he associated grand jury subpoenas and request letters for these records all post-date significantly Agent Shapiro's search of [her] cellphone,

---

[19] The court will address the Government's supplemental motion in a separate decision.

[20] Block and Zelle are digital payment networks that facilitate peer-to-peer instant payment services.

[21] Although Fox's motion also references tax and bank records, the court does not discuss them here because it already determined their admissibility when resolving the Government's motions *in limine*. *See supra* Part III.A.2.

raising at least a question about whether law enforcement's decision to pursue these particular pieces of information was prompted by information obtained during the illegal" searches of Fox's devices. (*Id.*) In response, the Government relies on its arguments set forth in its motions *in limine*. (Gov't Opp. at 12.) The court has already explained why discovery of both tax and toll records "would have been more likely than not inevitable absent the [illegal] search." *Eng I*, 971 F.2d at 862; *see supra* Part III.A.2. Put differently, analyzing the Government's investigation as it "existed at the instant before the unlawful search," it is more likely than not that HSI would inevitably seek and obtain the relevant Block and Zelle records. *Eng II*, 997 F.2d at 990. Fox argues that the "the affidavits of the agents involved in the investigation prior to the illegal searches make no reference to typically pursuing such records (unlike the more standard bank records and tax records)." (Fox's Reply at 1.) ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It is more likely than not that the Government's investigation would inevitably seek such records regardless of Special Agent Shapiro's misconduct. Thus, the Block and Zelle records do not constitute fruits of the illegal searches.

Lastly, Fox asks the court to exclude, as fruits of the illegal searches, "[c]ertain email returns obtained by the government in response to search warrants issued based on the information from the illegal search of [her] cellphone and the invalidated search warrant for her phone and laptop." (Fox's Mot. at 5.) To that end, Fox specifically moves to exclude a "set of documents [that] is . . . information associated with" a certain e-mail account "from the E-Mail Provider 'GoDaddy,'" and "Google returns and an associated forensic examination report of a Gmail account used by co-defendant Maneka Duffy and certain Yahoo returns

and an associated forensic examination report of a Yahoo e-mail account used by co-defendant Dominique Flynn." (*Id.* at 5-6.) There is, however, no live controversy as to these records because the Government does not contest any of the arguments advanced by Fox in her motion. (*See generally* Gov't Opp.) Indeed, while the Government initially moved to admit relevant forensic data from Fox's co-defendants' email accounts, (*see* Gov't Mot. at 36-37), the Government later stated that it "no longer intends to offer such data in its case-in-chief," (Gov't Letter to Court Dated 5/19/2025.) Therefore, this request is also unripe for resolution.

In sum, the court denies Fox's requests to exclude lay witnesses, other than the second witness identified in the Government's supplemental motion *in limine*, and e-mail returns without prejudice should the Government attempt to offer such lay witness testimony or e-mail records into evidence. The court further denies Fox's motion to preclude the Government from offering into evidence the statements of Witness-1 and certain financial records identified above.

2.    Testimony Regarding Co-Conspirators' Employment

Next, Fox moves to preclude the Government from introducing testimony that the members of the alleged conspiracy were employed by Delta or at LGA. (Fox's Mot. at 14 (arguing that this evidence "would not seem to have any tendency to make a fact in dispute more or less probable or to bear on any element of the charged crime").) Fox adds that if the Government intends to argue that this evidence would "imply that lots of employees at Delta and LaGuardia engaged in fraud," making it "more probable that [she] engaged in fraud, this would seem to violate" FRE 403. (*Id.*) The Government counters that this kind of evidence would establish the connection of the co-conspirators "based in part on their employment" and "provide background for the events alleged in the indictment." (Gov't Opp. at 28.) Moreover,

60

the Government notes that "the knowing sending of PPP funding to LGA-based employees is highly relevant to venue." (*Id.* at 29.) The Government further points out that it does not intend to use this evidence for propensity purposes, that is, to argue that because a lot of Delta or LGA employees engaged in PPP fraud, Fox is more likely to have done so too based on her employment there as well. (*Id.* at 30.) In her reply, Fox notes that "[t]here is no allegation to date that [she] recruited anyone to participate in fraud through her employment as a flight attendant at Delta." (Fox's Reply at 5.) Fox also argues that employment evidence does not advance the venue argument either because being an LGA-based employee does not necessarily mean that one lives in the EDNY. (*Id.*)

Evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" is relevant if such "fact is of consequence in determining the action." Fed. R. Evid. 401. The Second Circuit has noted that the standard for relevance is very low. *See United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012). "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). But even if relevant, "[t]he court may exclude . . . evidence if its probative value is substantially outweighed by," among other things, "a danger of . . . unfair prejudice, confusing the issues, misleading the jury, [and] undue delay." Fed. R. Evid. 403. FRE 403 "favors admissibility." *White*, 692 F.3d at 247 (recognizing that "evidence is only excluded when its probative value is *substantially outweighed* by the prejudice of jury confusion").

Here, co-conspirators' employment with Delta or at LGA is relevant to establishing the background story of the conspiracy charged. ████████████████████████████████████

The fact that HSI's investigation targeted various Delta employees or individuals employed at LGA makes it more probable that Fox conspired with other to engage in the conspiracy charged in the underlying Indictment. Fed. R. Evid. 401. And the Government does not intend to offer this evidence for propensity reasons. That "favors admissibility" of this evidence under the FRE 403 analysis. *White*, 692 F.3d at 247. Having found that the testimony regarding employment of the members of the alleged conspiracy by Delta or at LGA is relevant and does not present such danger of prejudice that would substantially outweigh the probative value of the evidence, the court denies Fox's motion.

### 3. Taxpayer Funding of PPP and EIDL

Third, Fox seeks to preclude the Government from arguing that taxpayers funded the PPP loan or the EIDL program or presenting evidence regarding the same. (Fox's Mot. at 15.) Fox adds that "arguments pertaining to the jurors' pecuniary interests as taxpayers are improper." (*Id.*) The Government does not intend to make such arguments. (Gov't Opp. at 30.) Because there is no live controversy regarding this issue, the court denies Fox's motion without prejudice to renewal should the Government change its position.

### 4. Government's Rule 16 Materials

Finally, Fox requests the court to preclude the Government from "introduc[ing] at trial any Rule 16 discovery materials it has previously obtained but not yet disclosed as of" May 7, 2025. (Fox's Mot. at 15-16.) Fox asserts that she would be prejudiced by a late

Rule 16 disclosure because it would impair her "ability to litigate suppression issues far enough in advance of trial to obtain rulings that bear directly on her decision whether or not to proceed to trial." (Fox's Reply at 6.) The Government opposes the motion and maintains that "[a]ny supplemental discovery productions based on the government's continual pretrial review of the case-file would likely be limited in size and be provided many weeks before trial." (Gov't Opp. at 31.) Fox made this motion when she was scheduled to go to trial on June 30, 2025. Since then, the court has granted Fox's request to move her trial to November 3, 2025. (*See* Text Order Dated 6/12/2025.) As such, the court denies her motion without prejudice to renewal.

## IV. CONCLUSION

For the foregoing reasons, the Government's motions *in limine* are GRANTED in part and DENIED in part, and Fox's motions *in limine* are DENIED.

In particular, the court rules as follows with respect to each motion *in limine*:

- The Government's request that the court delay any decision regarding what evidence is tainted because of law enforcement's illegal search of Fox's personal devices until after trial is DENIED.

- The Government's motion *in limine* to admit the SBA loan contracts, bank records, tax records, call-detail records, IP address records, materials submitted with loan applications, and business emails is GRANTED subject to certain limitations set forth in Part III.A.2.b.

- The Government's motion *in limine* to admit the statements made by Witness-1, a co-conspirator in the scheme, and others regarding the identities and records pertaining

63

to certain charged and uncharged co-conspirators pursu-
ant to FRE 801(d)(2)(E) is GRANTED on a conditional
basis; the Government may not refer to them in its open-
ing statement.

- The court RESERVES DECISION on the Government's
  motion *in limine* to allow the Government to admit the
  illegally obtained evidence, as well as the fruits of such
  evidence, as impeachment evidence during Fox's possible
  testimony.

- The court GRANTS the Government's motion *in limine* to
  introduce the paperwork of Fox's EIDL loan applications
  for the limited purpose of showing intent, knowledge, or
  lack of mistake. The court will provide a limiting instruc-
  tion if so requested. *See* Fed. R. Evid. 105

- The Government's motion *in limine* to preclude Fox from
  making references to or arguments about the illegal
  search of her devices is DENIED without prejudice to re-
  newal should Fox retreat from her current position of not
  asking questions of witnesses or making jury arguments
  about the illegal search.

- The Government's motion *in limine* to preclude Fox from
  arguing that the Government should have prosecuted this
  case elsewhere is DENIED without prejudice to renewal
  should Fox retreat from her current position that it does
  not intend to make such argument as long as the Govern-
  ment meets its burden of proving that venue is proper in
  the EDNY.

- The Government's motion *in limine* to preclude Fox from
  offering evidence or argument concerning (i) any poten-
  tial punishment or consequences of her conviction; (ii)
  her personal background or other facts designed to appeal

64

to the jury's emotions; or (iii) her prior good acts is DE-NIED without prejudice to renewal should Fox retreat from her current position of not pursuing jury nullification or attempting to introduce any prior good acts evidence for propensity reasons. Fox may introduce prior good acts evidence for the limited purpose of disproving knowledge or intent.

- The court GRANTS the Government's motion *in limine* to preclude Fox from arguing that the PPP lenders or the SBA's failure to detect the alleged fraud or the notion that they provided any misleading information on their forms is relevant to Fox's knowledge and intent.

- The Government's motion *in limine* to preclude arguments regarding the prevalence of PPP fraud is DENIED without prejudice to renewal should Fox retreat from her current position of not making such arguments.

- The court DENIES without prejudice the Government's motion *in limine* to preclude Fox from arguing that a statement contained in a law enforcement report provided as Jencks Act material or material produced pursuant to Federal Rule of Criminal Procedure 26.2 is a statement of the witness being interviewed. The Government may renew its motion should Fox attempt to improperly use law enforcement reports of witness interviews for impeachment purposes at trial.

- The court GRANTS the Government's motion *in limine* directing Fox to produce (i) any defense discovery materials and defense exhibits by October 27, 2025; and (ii) material pursuant to Federal Rule of Criminal Procedure 26.2 for defense witnesses no later than two days before the relevant witness's testimony.

- Fox's motion *in limine* to exclude lay witnesses, other than the second witness identified in the Government's supplemental motion *in limine*, and e-mail returns is DENIED without prejudice to renewal should the Government attempt to offer such lay witness testimony or e-mail records into evidence. The court further DENIES Fox's motion *in limine* to preclude the Government from offering into evidence the statements of Witness-1 and the Block and Zelle records.

- The court DENIES Fox's motion *in limine* to preclude the Government from introducing testimony regarding employment of the members of the alleged conspiracy by Delta or at LGA pursuant to Rules of Evidence 401 and 403.

- Fox's motion *in limine* to preclude the Government from arguing that taxpayers funded the PPP loan or the EIDL program or presenting evidence regarding the same is DENIED without prejudice to renewal should the Government retreat from its current position that it does not intend to make such arguments.

- The court DENIES without prejudice to renewal Fox's motion *in limine* to preclude the Government from introducing at trial any Rule 16 discovery materials the Government has previously obtained but not yet disclosed as of May 7, 2025.

SO ORDERED.

Dated:    Brooklyn, New York
          July 23, 2025

                                    s/Nicholas G. Garaufis

                                    NICHOLAS G. GARAUFIS
                                    United States District Judge