UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

                        -against-

JASMINE FOX,

                        Defendant.

**MEMORANDUM & ORDER
23-CR-227 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Jasmine Fox moves *in limine* to exclude her post-ar-
rest statements made on June 13, 2023. (Fox's Mot. (Dkt. 130)
at 6-14; Government's Opp. ("Gov't Opp.") (Dkt. 142) at 13-28;
Fox's Reply (Dkt. 147) at 2-5.) Simultaneously, the Government
moves *in limine* to admit the same into evidence. (Government's
Mot. ("Gov't Mot.") (Dkt 132) at 30-36; Fox's Opp. (Dkt 139) at
9-12; Government's Reply (Dkt 150) at 13-18.) Following an ev-
identiary hearing held on June 10, 2025, (Min. Entry Dated
6/11/2025), the parties submitted their proposed findings of fact
and conclusions of law, (Fox's Proposed Findings of Fact & Con-
clusions of Law ("Fox's Findings & Conclusions") (Dkt. 173);
Fox's Suppl. Proposed Findings of Fact & Conclusions of Law
("Fox's Suppl. Findings & Conclusions") (Dkt. 178);[1] Gov't Pro-
posed Findings of Fact & Conclusions of Law ("Gov't Findings &
Conclusions") (Dkt. 179); Fox's Resp. to Gov't Findings & Con-
clusions (Dkt. 181).) For the reasons set forth below, the court

---

[1] In her supplemental filing, Fox moves to admit "the Pre-Operation Plan,
the Arrest Warrant, and the Interview Outline . . . into evidence" without
stating any bases for their relevance or admissibility. (Fox's Suppl. Findings
& Conclusions at 2.) The court hereby directs Fox to state the legal bases
for admitting these documents into evidence as part of her supplemental
motions *in limine* for which the court has already set a briefing schedule.
(*See* Text Order Dated 6/12/2025.)

1

GRANTS Fox's motion *in limine* and DENIES the Government's motion *in limine*.

## I.    BACKGROUND

The court presumes the parties' familiarity with the underlying facts and procedural history of this case. *See United States v. Fox*, No. 23-CR-227 (NGG), 2024 WL 3520767, at *2-4 (E.D.N.Y. July 24, 2024). (*See also* Mem. & Order Dated 7/23/2025 (Dkt. 184) at 1-4.) On May 25, 2023, a federal grand jury charged Defendants Jasmine Fox, Kariva Cross-McKnight, Maneka Duffy, Dominique Flynn, and Loren Parker Jr. in a single-count indictment. (*See generally* Indictment (Dkt. 1).)[2] The sole count in the Indictment alleges Wire Fraud Conspiracy, in violation of 18 U.S.C. §§ 1343, 1349. (*Id.* ¶¶ 21-22.)

On June 10, 2025, the court held an evidentiary hearing "limited to determining whether and when [Internal Revenue Service-Criminal Investigation ('IRS-CI')] Special Agent Nabila Khatun advised [Fox] of her *Miranda* rights before [Fox] signed a *Miranda* waiver form on June 13, 2023, at 8:11 p.m." after her arrest. (Scheduling Order Dated 5/28/2025; Min. Entry Dated 6/11/2025.) The Government offered the testimony of Special Agent Khatun ("Agent Khatun"), while Fox testified on her own behalf. (*See generally* Evidentiary Hr'g Tr. ("Hr'g Tr.") (Dkt. 175).) At the conclusion of the hearing, the court directed the parties to submit their proposed findings of fact and conclusions of law by June 18, 2025. (Min. Entry Dated 6/11/2025.) The parties' submissions followed. (Fox's Findings & Conclusions;

---

[2] All of the Defendants, except for Fox, have since entered a Plea of Guilty. (Min. Entry Dated 3/5/2024 (Dkt. 78) (Cross-McKnight Plea); Min. Entry Dated 5/2/2025 (Dkt. 125) (Parker Plea); Order Accepting Parker Plea (Dkt. 151); Min Entry Dated 5/12/2025 (Dkt. 135) (Flynn Plea); Min. Entry Dated 5/14/2025 (Dkt. 136) (Duffy Plea).)

Fox's Suppl. Findings & Conclusions; Gov't Findings & Conclusions.) Fox's trial is scheduled to begin on November 3, 2025. (Text Order Dated 6/12/2025.)

## II. FINDINGS OF FACT

Now, pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the court "state[s] its essential findings on the record." Fed. R. Crim. P. 12(d).

### A. Background & Pre-Operation Plan

On September 21, 2021, Special Agent Edward Shapiro of Homeland Security Investigations ("HSI") opened a formal investigation into potential criminal activities involving employees working at LaGuardia Airport, including those employed by Delta Air Lines. *Fox*, 2024 WL 3520767, at *2. As part of the investigation, on June 13, 2023, Agent Khatun participated in a joint operation between the IRS-CI, the U.S. Marshals Service ("USMS"), and the HSI, to arrest Fox in Las Vegas, Nevada. (Hr'g Tr. 10:25-11:6, 35:18-20.) Agent Khatun "had [not] been involved in the investigation into Jasmine Fox prior to her arrest." (*Id.* 11:7-9.)

Agent Khatun has worked for the IRS for approximately nine years, including about five years within the IRS-CI. (*Id.* 4:3-10.) Between the summers of 2020 and 2021, Agent Khatun completed a six-to-seven-months long training at the Federal Law Enforcement Training Center ("FLETC") in Brunswick, Georgia. (*Id.* 5:2-15.) At her FLETC training, Agent Khatun received a *Miranda* rights card, one side of which contains an "in-custody statement of . . . rights," while the other side includes a "non-custody statement of rights" that "is more IRS-specific." (*Id.* 6:20-7:2.) As a general practice, Agent Khatun reads an arrestee their *Miranda* rights as soon as it is safe and practicable to do so. (*Id.* 8:17-20.)

Now, part of her duties and responsibilities as an IRS-CI Special Agent includes investigating potential criminal violations of the Internal Revenue Code and other financial crimes of similar nature. (*Id.* 4:11-18.) Agent Khatun is stationed out of IRS-CI's New York field office in the Bronx, New York. (*Id.* 4:19-22.) She was selected for the Fox arrest because the IRS-CI has a general practice of including a female agent to participate in the arrest of a female suspect for the suspect's comfort. (*Id.* 11:12-20.)

About a few days before the arrest, Agent Khatun attended a pre-operation meeting, via Microsoft Teams or a similar video conference platform, during which the participants discussed law enforcement planning, including the individual subjects and locations. (*Id.* 13:12-21.) By attending the meeting, Agent Khatun learned certain information about Fox's educational background and employment status, and that this was a Paycheck Protection Program ("PPP") fraud case involving multiple suspects. (*Id.* 12:21-25, 92:22-93:1.) Agent Khatun flew from New York to Las Vegas on June 13, 2025, for the sole purpose of participating in Fox's arrest. (*Id.* 11:24-12:2, 12:13-15.) Although the original plan was to arrest Fox the following day, Special Agent Sandip Singh of the IRS-CI ("Agent Singh"), who picked up Agent Khatun from the airport, informed her that they had moved up the arrest to the evening of June 13, 2025. (*Id.* 12:5-12, 23:3-11.)

Thereafter, Agent Singh drove Agent Khatun to the pre-operation staging site located near the arrest location. (*Id.* 12:10-12, 14:9-13.) At the pre-operation staging site, Agent Singh and Agent Khatun reviewed the logistics of the arrest with other law enforcement personnel participating in Fox's arrest, including one other IRS-CI agent, several HSI agents, and U.S. Marshals from the USMS. (*Id.* 14:14-20, 15:4-8.) According to the plan discussed at the pre-operation site, the U.S. Marshals were the designated "entry team" to make the physical apprehension of

4

Fox. (*Id.* 15:21-24.) Agent Khatun was part of the "security cover team," which was tasked with ensuring the safety of the premises and the perimeter, as well as the general public. (*Id.* 16:19-25.) However, in her role, Agent Khatun never entered the premises. (*Id.* 16:20.)

### B.  Arrest & Drive to the Detention Center

At some point between 5:00 p.m. and 6:00 p.m., the U.S. Marshals entered the hookah lounge owned by Fox and arrested her. (*Id.* 17:11-23; 97:19.) Agent Khatun was not the "arresting officer," meaning she was not the person who handcuffed Fox. (*Id.* 36:4-8.) Instead, within minutes of Fox's arrest, Agent Khatun encountered her for the first time at or near the transport vehicle, which was parked outside the back entrance to the hookah lounge. (*Id.* 20:8-20.) At that point, already handcuffed, Fox was hysterical and crying. (*Id.* 20:22-25, 109:2-12.) Agent Khatun attempted to calm her down by reminding Fox to breathe and telling her that she would likely be out on bail very quickly. (*Id.* 21:10-16.) Then, Agent Khatun helped the arresting officers put Fox into the transport car. (*Id.* 38:13-14.)

After Agent Khatun and Fox got in the car, Agent Khatun showed Fox the arrest warrant. (*Id.* 65:14-21.)[3] Thereafter, Agent Singh

---

[3] Agent Khatun testified that while they were inside the car and the driver of the vehicle, Agent Singh, was getting ready to drive, she read Fox her *Miranda* rights from the "in-custody statement" side of her *Miranda* rights card. (Hr'g Tr. 21:21-22:5.) Fox directly contradicted Agent Khatun's testimony. (*Id.* 106:2-3.) The court does not find Agent Khatun's testimony credible for the following reasons. First, while initially testifying that she read Fox her *Miranda* rights in the car, on cross-examination, Agent Khatun could not recall if she "was right outside the vehicle . . . or in the vehicle reading [Fox] her rights." (*Id.* 50:21-23.) Second, the Government has not provided any corroborating witness testimony or affidavit, such as one by Agent Singh, who was in the car, or one of the arresting U.S. Marshals, who was near the transport vehicle, when Agent Khatun first interacted with Fox, to verify Agent Khatun's testimony. Third, Agent

drove the transport vehicle to another parking lot. (*Id.* 100:16-18, 112:19-20.) Once they arrived at the parking lot, Agent Khatun got out of the car to retrieve the keys to Fox's handcuffs from another law enforcement official. (*Id.* 100:24-101:5.) Agent Khatun first uncuffed Fox's hands so she could move her hands to the front and then front-cuffed Fox's hands. (*Id.* 101:5-6, 113:22-24.) While Agent Khatun was away and Fox was waiting in the car, another agent that Fox had not encountered before approached to tell her that everything was going to be okay and that he had seen worse cases than Fox's. (*Id.* 101:6-9.)

When Agent Khatun returned to the car, she continued comforting Fox and started asking her questions about the PPP and her businesses. (*Id.* 101:16-102:1, 117:3-6.) [4] Eventually, when Agent Singh also returned to the transport vehicle, he started

---

Khatun could not recall Fox's response to Agent Khatun's supposed reading of Fox's *Miranda* rights to her. (*Id.* 52:8-23.) She simply assumed that Fox "must have given [her] some type of affirmation." (*Id.* 52:15.) Fourth, Agent Khatun could not even recall who witnessed Fox's response to Agent Khatun's reading of the *Miranda* rights. (*Id.* 64:9-14.)

[4] Agent Khatun and Fox offered contradictory testimonies as to who started the conversation. While Agent Khatun testified that "Ms. Fox started . . . asking me questions, case-specific questions and making statements," (Hr'g Tr. 24:3-4), Fox testified that Agent Khatun "started . . . jogging my memory, just throwing things out," (*id.* 101:22-102:1.) Furthermore, Fox testified that after leaving the arrest location, they made an intermediate stop at a parking lot, (*id.* 100:16-18), while Agent Khatun could not recall making a stop in-between the arrest location and the detention center, (*id.* 64:22-65:9.) As to both points, the court credits Fox's testimony because she provided specific examples from her recollection, including the kinds of questions asked, (*id.* 101:24-102:1), and specifics regarding her interactions with law enforcement agents, (*id.* 101:5-21), whereas Agent Khatun could not recall the specifics at all. Additionally, while Agent Khatun first testified that she had not received any case-related documents other than the pre-operation plan, (*id.* 24:22-25), on cross-examination, after being confronted with video evidence, she admitted that she had an "Interview Outline" on her lap in the car with Fox, containing various case-related questions, (*id.* 56:13-57:12.)

driving Agent Khatun and Fox to the detention center. (*Id.* 102:6-7.) During the car ride, Agent Khatun continued to ask Fox more questions, including investigative questions related to PPP fraud, some of which Fox answered. (*Id.* 24:18-21, 102:7-9.) Soon thereafter, the agents began recording the conversation via a cell-phone video camera. (*Id.* 72:3-9; 102:9-12.) The entire car ride lasted about 30-40 minutes, more than 23 minutes of which the agents video recorded. (*Id.* 25:1-5, 102:18-19; *see also* Partial Recording of First Custodial Interrogation (Dkt. 133-8).) During the custodial interrogation in the car, Fox made some inculpatory statements regarding falsifying documents submitted in connection with PPP loan applications. (Partial Recording of First Custodial Interrogation at 0:19:38-55.)

Between her arrest at the lounge and arrival at the detention center, neither Agent Khatun nor any other law enforcement official informed Fox of her *Miranda* rights.[5] Nor is such reading evident from the partial recording of the first custodial interrogation. (*See generally id.*)

---

[5] Agent Khatun testified that she read Fox her *Miranda* rights a second time after Fox started asking questions and making statements following the first *Miranda* warning. (Hr'g Tr. 24:3-6 ("Fox started . . . asking me questions[.] . . . I don't recall exactly what was said. I just recall it was enough for me to re-Mirandize her.").) But Fox directly contradicted Agent Khatun's testimony, instead stating that Agent Khatun did not read her the *Miranda* warnings at any point before they arrived at the detention center. (*Id.* 103:7-16, 104:1-3.) The court does not find Agent Khatun's testimony credible. First, Agent Khatun could not recall what "case-specific questions" Fox asked or what kind of statements Fox made that allegedly prompted her to re-*Mirandize* Fox and ask Agent Singh to start recording the conversation. (*Id.* 24:3-8, 15-17.) Second, as the court noted above, the Government failed to provide corroborating witness testimony or an affidavit from Agent Singh to confirm the accuracy of Agent Khatun's testimony. Third, Agent Khatun again failed to testify as to how she confirmed that Fox understood her *Miranda* rights.

### C. Detention Center Interview

Upon arriving at the detention center, the agents and Fox waited for a little while for Fox to be processed. (Hr'g Tr. 25:6-8.) While waiting, the agents decided that Agent Khatun would be the lead interviewer in the interrogation room because she had already built rapport with Fox during the earlier interrogation. (*Id.* 26:6-7.) By the time Fox arrived in the interview room, compared to her emotional state during her arrest, she was relatively calm and quiet. (*Id.* 26:16-19.) Nevertheless, she still appeared distressed, scared, and concerned. (*See, e.g.*, Recording of Second Custodial Interrogation (Dkt. 133-9) at 0:00:06-15.) In addition to Agent Singh, HSI Special Agent Anthony Pishchulin ("Agent Pishchulin") also joined Agent Khatun for the second interrogation. (Hr'g Tr. 28:19-21.)

The recording of the interview begins at around 8:09 p.m. at night. (*See* Recording of Second Custodial Interrogation at 0:02:18 (stating that it is 8:11 p.m.).) About a minute into the recording, Agent Khatun tells Fox that she "read [Fox] [her] [*Miranda*] rights already, but [she] just want[s] [Fox] to look over them again," and that she is going to "have [Fox] sign them." (*Id.* at 0:01:07-14.) Agent Khatun also tells Fox that this process—reading Fox her *Miranda* rights and having her sign the waiver form—"is for your protection and mine." (*Id.* at 0:01:16-17.) For more than a full minute, Fox appears to continuously nod her head in reaction to the agents' statements or questions—including to Agent Khatun's statement that she read Fox her *Miranda* rights already—regardless of whether the agents sought a response from her. (*Id.* at 0:00:06-01:18.) [6] Thereafter, Agent

---

[6] The court does not find Fox's continuous nodding or barely audible "mm-hmm" to be an acknowledgment that Agent Khatun read her the *Miranda* warnings earlier. To start, as the court found above, at this point in the interrogation, Fox was still visibly distressed, scared, and concerned, nodding her head in reaction to almost every statement made by the agents.

Khatun reads Fox her *Miranda* rights from the Waiver Form, (*id.* at 0:01:23-02:04), and agents start telling Fox the time and the date to fill out *before* Fox even gets a chance to look at the form, (*id.* at 0:02:07-14.) As Fox grabs a pen and takes her first look at the document, Agent Khatun points to the relevant sections of the Waiver Form for Fox to sign and date. (*Id.* at 0:02:14-47.) Fox does not appear to have read the Waiver statement above the signature line as Agent Khatun points to pertinent sections of the form with her index finger and Agent Singh makes a comment about how late the time is. (*Id.*) While Agent Singh and Agent Pishchulin sign the Waiver Form, Agent Khatun tells Fox, "let's pick up from where we left off." (*Id.* at 0:03:06-10.)

Similar to some of the inculpatory statements Fox made during her first custodial interview in the transport vehicle, she makes additional incriminating statements during her interrogation at the detention center about falsifying PPP loan application documents. (*See, e.g., id.* at 0:19:47-21:02.) About 21 minutes into the interrogation, Agent Singh starts to make references to text messages that appear to have been retrieved from Fox's illegally searched devices. (*Id.* at 0:21:02-24:25.) The interview appears

---

Moreover, Fox also testified that she was "under a lot of stress" and did not "want to correct an authoritative figure at that moment, especially with them in the room," while acknowledging that she "should have spoke[n] up for [herself]." (Hr'g Tr. 104:5-13.) Lastly, Agent Khatun does not even explicitly mention the rights when she makes an initial reference to Fox's *Miranda* rights; instead referring to them as "your rights," before reading them from the Waiver Form. (Recording of Second Custodial Interrogation at 0:01:07-02:10; Waiver Form (Dkt. 130-5).) And before reading Fox her *Miranda* rights, rather than telling Fox to consider whether she wants to sign the Waiver Form or not, Agent Khatun commands that she is going to "have [Fox] sign them," and hands the Waiver Form to Fox after reading Fox her *Miranda* rights, making it seem like Fox did not have a choice but to waive her rights. (Recording of Second Custodial Interrogation at 0:01:07-14, 0:02:10-14.)

to conclude after a little more than an hour of questioning. (*See generally id.*)

## III. CONCLUSIONS OF LAW

The parties raise their respective arguments concerning Fox's post-arrest statements as part of their motions *in limine*. (Fox's Mot. at 6-14; Gov't Mot. at 30-36.) Thus, the court addresses the admissibility of Fox's post-arrest statements in the context of an *in limine* motion, which "aid[s] the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996); *see also United States v. Bowen*, 511 F. Supp. 3d 441, 446 (S.D.N.Y. 2021) (applying the same reasoning in a criminal case).[7]

The court excludes all of Fox's post-arrest statements because law enforcement personnel obtained Fox's confessions by deliberately engaging in a two-step interrogation practice that evades the procedural safeguards of *Miranda* warnings and violates Fox's rights under the Fifth Amendment to the U.S. Constitution. And because the court finds a Fifth Amendment violation, it does not address the parties' arguments regarding fruits of the illegal search and admissibility under the Federal Rules of Evidence ("Rules of Evidence").

In relevant part, the Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. The Supreme Court in *Miranda v. Arizona* held that "the prosecution may not use statements, whether exculpatory or

---

[7] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The Court then spelled out the following procedural safeguards that are now colloquially referred to as the *Miranda* warnings: "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

The Court in *Miranda* also held that "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* In other words, "[t]o prove a valid waiver, the government must show (1) that the relinquishment of the defendant's right was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam). As to the first element, a waiver is voluntary when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). With respect to the second element, a valid waiver requires the prosecution to "show[] that the accused understood [her] rights." *Id.* at 384. As such, "[a] confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (noting that "[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials").

But law enforcement need not give *Miranda* warnings "in the exact form described in that decision" for them to convey to the

11

suspect all of their fundamental rights under the Fifth Amendment. *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989); *see also United States v. Payne*, No. 19-CR-170 (RJA) (MJR), 2021 WL 9978612, at *20 (W.D.N.Y. Dec. 29, 2021) (concluding that the defendant's decision to waive his *Miranda* rights was not involuntary simply because "it would have been wise for [him] to take more time to consider his rights, and the effect of waiving them, before signing" the waiver form), *report, recommendation, and order adopted sub nom. by United States v. Hay*, 2023 WL 142119, at *3 (W.D.N.Y. Jan. 10, 2023). For example, a suspect may knowingly waive her rights through a written waiver where "[t]he waiver [i]s executed through a standard, written document . . . , covers all of the relevant rights, and [i]s read to" the suspect. *United States v. Alcantara*, No. 9-CR-231 (NRB), 2009 WL 4756491, at *10 (S.D.N.Y. Dec. 2, 2009) (noting that the defendant "nodded along, indicating that he understood what he was hearing[,] . . . then initialed, wrote in, and signed the relevant areas of the form"); *see also United States v. Artis*, No. 10-CR-15 (CCR), 2010 WL 3767723, at *8 (D. Vt. Sept. 16, 2010) (finding that the defendant waived his *Miranda* rights "with full awareness and comprehension" where he "was read his *Miranda* rights from a simple, one-page, pre-printed form that set forth each right in clear, simple, and concise language," and the defendant "initialed each right after it was given").

"The course of decisions since *Miranda* . . . demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered." *Berghuis*, 560 U.S. at 383. Put differently, while "[a]n express written or oral statement of waiver of the right to remain silent . . . is usually strong proof of the validity of that waiver," it "is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373, 376 (1979) (concluding that "[b]y creating an inflexible rule that no implicit waiver [of *Miranda*

rights] can ever suffice, the North Carolina Supreme Court [went] beyond the requirements of federal organic law"). Therefore, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384.

In general, "[i]f a suspect is not provided with *Miranda* warnings," *Miranda* bars the prosecution "from using statements obtained during the interrogation to establish its case in chief." *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009); *Miranda*, 384 U.S. at 479 (holding that "unless and until [the *Miranda*] warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against" the defendant). If "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate" the defendant's knowing and intelligent waiver of their privilege against self-incrimination. *Miranda*, 384 U.S. at 475; *see also Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (clarifying that the "heavy burden" is nothing more than the burden of "prov[ing] waiver . . . by a preponderance of the evidence"); *United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002) (recognizing that the government carries the burden of proving that the defendant relinquished his *Miranda* rights).

Nevertheless, "not every violation of the *Miranda* rule requires suppression of the evidence obtained." *Missouri v. Seibert*, 542 U.S. 600, 618 (2004) (Kennedy, J., concurring in judgment). For example, in *Oregon v. Elstad*, the Supreme Court grappled with the question of whether "an initial failure of law enforcement officers to administer the [*Miranda*] warnings . . . , without more, 'taints' subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights." 470 U.S. 298, 300 (1985). There, "at the time [the suspect] made his [prewarning]

statement he had not been informed that he was under arrest." *Id.* at 315. Indeed, "[t]he arresting officers' testimony indicate[d] that the brief stop in the living room before proceeding to the station house was not to interrogate the suspect but to notify his mother of the reason for his arrest." *Id.* at 315.

Ultimately, the Court found that "the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony [were] fully satisfied in the circumstances of [*Elstad*] by barring use of the unwarned statement in the case in chief." *Id.* at 318. To that end, the Court reasoned that "[n]o further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id.* (holding "that a suspect who has once responded to unwarned yet *uncoercive* questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings" (emphasis added)).

The Court's reasoning and holding in *Elstad* apply to cases where law enforcement makes "a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning . . . , but posing no threat to warn-first practice generally." *Seibert*, 542 U.S. at 615 (plurality opinion);[8] *see also United States v. Capers*, 627 F.3d 470, 475 (2d Cir. 2010) (describing *Elstad* as "involv[ing] a good-faith effort by the police to administer a

---

[8] The Supreme Court in *Seibert* failed to elicit a majority opinion. But the Second Circuit "has clarified that Justice Kennedy's opinion, which provided the fifth vote for the result in the case, is controlling." *Jones v. Murphy*, 694 F.3d 225, 246 n.13 (2d Cir. 2012); *United States v. Carter*, 489 F.3d 528, 535-36 (2d Cir. 2007) (joining several sister circuits in concluding that "*Seibert*, rather than overruling *Elstad*, carved out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession") (collecting cases). Therefore, unless otherwise noted, the court's citation to *Seibert* is to Justice Kennedy's "narrower test" set forth in his opinion. *See Seibert*, 542 U.S. at 622.

proper *Miranda* warning"). However, where law enforcement delivers *Miranda* warnings midstream as part of "a two-step interrogation strategy designed to elicit a post-*Miranda* waiver and confession after the defendant had already confessed before he was given *Miranda* warnings," that "strategy violate[s] *Miranda*." *Capers*, 627 F.3d at 475 (explaining that, "unlike in *Elstad*, the unwarned interrogation [in *Seibert*] was systematic, exhaustive, and managed with psychological skill"); *see also Hernandez v. McIntosh*, --- F.4th ---, No. 24-1816, 2025 WL 2025555, at *12 (2d Cir. July 21, 2025) ("In *Seibert*, the Supreme Court held unconstitutional then-common tactic of intentionally obtaining an inadmissible, un-*Mirandized* confession, administering a *Miranda* warning after the suspect had confessed, and finally asking the suspect to repeat the confession post-warning.").

Under *Seibert*, the court must first determine "whether law enforcement deliberately engaged in a two-step interrogation practice and, second, whether intervening 'curative measures' 'allowed the accused to distinguish' the several rounds of questioning." *Hernandez*, 2025 WL 2025555, at *13 (quoting *Seibert*, 542 U.S. at 622). Justice Kennedy described law enforcement's improper tactic in *Seibert* as follows: "[t]he strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained." 542 U.S. at 620. He specifically highlighted "the interrogating officer['s] . . . reli[ance] on the defendant's prewarning statement to obtain the postwarning statement used against her at trial," describing the postwarning interview as one "resembl[ing] a cross-examination." *Id.* at 621. But "Justice Kennedy had no reason to explore how a court should determine when a two-step interrogation strategy had been executed deliberately" in *Seibert*, "because the record [there] was clear that the interrogating officers intentionally and purposefully employed a technique in which they had been instructed." *Capers*, 627 F.3d at 477. The Second Circuit has

since "join[ed] [its] sister circuits in concluding that a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *Id.* at 479. And "the burden rests on the prosecution to disprove deliberateness." *Id.*

Next, "postwarning statements that are related to the substance of the prewarning statements must be excluded absent specific, curative steps." *Seibert,* 542 U.S. at 621. Justice Kennedy identified two possible curative measures in *Seibert* that may be sufficient in most situations: "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning," or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* at 622 (noting that curative measures "allow[] the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn"); *see also Hernandez,* 2025 WL 2025555, at *13 (holding that the petitioner's "confession fits precisely the mold addressed in *Seibert*" because "[a]lmost immediately after [his incriminating] statement, the detectives administered *Miranda* warnings and law enforcement officials began recording the [CCTV] feed," asking the petitioner to repeat his earlier statements).

As an initial matter, the parties agree that "Fox was in custody from the point at which she was arrested by the USMS in the lounge at approximately 6 p.m. on June 13, 2023." (Fox's Findings & Conclusions ¶ 34; *see also* Gov't Findings & Conclusions at 8 (arguing that "the defendant's motion to suppress her *in-custody* statements is unwarranted" (emphasis added)).) *Elstad,* 470 U.S. at 309 (clarifying that the *Miranda* warnings "need be administered only after the person is taken into 'custody' or his

freedom has otherwise been significantly restrained" (citing *Miranda*, 384 U.S. at 478)). In addition, the court notes that Fox made inculpatory statements about falsifying PPP loan application documents both *before* and *after* Special Agent Khatun warned Fox of her *Miranda* rights during the interrogation at the detention center. (Partial Recording of First Custodial Interrogation at 0:19:38-55; Recording of Second Custodial Interrogation at 0:19:47-21:02.)

Next, before Fox made inculpatory statements in the car, neither Agent Khatun nor any other law enforcement agent warned her of her *Miranda* rights. (Hr'g Tr. 103:7-16, 104:1-3.) As such, because Fox "[was] not provided with *Miranda* warnings," *Miranda* bars the Government "from using [Fox's] statements obtained during the [car] interrogation to establish its case in chief." *See Georgison*, 588 F.3d at 155; *Miranda*, 384 U.S. at 479 (holding that "no evidence obtained as a result of interrogation can be used against [the defendant]," "unless and until [*Miranda*] warnings and waiver are demonstrated by the prosecution"). At the beginning of her postwarning interrogation at the detention center, however, Fox signed a Waiver Form before making further incriminating statements. (*See* Waiver Form; Recording of Second Custodial Interrogation at 0:02:14-47.) The court acknowledges that before reading Fox her *Miranda* rights and handing her the Waiver Form, Agent Khatun engaged in questionable tactics by telling Fox that she is going to "have [Fox] sign them," which made it seem like Fox did not have a choice but to waive her rights. (Recording of Second Custodial Interrogation at 0:01:07-14, 0:02:10-14.) Nevertheless, the court concludes that Fox executed the Waiver Form voluntarily with "a full awareness of the right being waived and of the consequences of waiving that right." *See Jaswal*, 47 F.3d at 542.

First, Fox decided to sign the Waiver Form freely and without any coercion. Although she did not appear to read the "Waiver"

section of the form, Agent Khatun was under no obligation to emphasize to Fox that she should read the form for herself before executing it. *See Duckworth*, 492 U.S. at 202 (clarifying that law enforcement agents do not have to *Mirandize* the suspect "in the exact form described" in *Miranda*). Furthermore, the court surmises that Fox would have benefited from reading the Waiver Form for herself and thinking about her options before executing the form. But the fact that she chose to immediately sign the form does not deem her actions involuntary. *See Payne*, 2021 WL 9978612, at *20 (finding voluntary waiver of *Miranda* rights even though "it would have been wise for [the accused] to take more time to consider his rights, and the effect of waiving them, before signing" the waiver form). This is especially true "after a careful evaluation of the totality of all the surrounding circumstances, including [Fox's] characteristics." *See Anderson*, 929 F.2d at 99. As a tax preparer who carefully reviews documents before filing or signing them, (*see* Hr'g Tr. 106:16-25), Fox had the requisite scholastic background to decide whether to read the Waiver Form before signing it. Thus, Fox's execution of the Waiver Form was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382.

Second, Agent Khatun read the "Statement of Rights" section of the Waiver Form to Fox before handing the form to her. (Recording of Second Custodial Interrogation at 0:01:23-02:04; *see also* Waiver Form.) And that section of the form includes the requisite *Miranda* warnings, including that "[a]nything [Fox] say[s] can be used against [her] in court, or other proceedings," and that she has "the right to remain silent" and "the right to consult an attorney." (Waiver Form.) Fox's waiver "was executed through a standard, written document . . . , [that] cover[ed] all of the relevant rights, and was read to" Fox. *See Alcantara*, 2009 WL 4756491, at *10. That is sufficient for the prosecution to "show[] that [Fox] understood [her] rights." *Berghuis*, 560 U.S. at 384;

18

*see also Artis*, 2010 WL 3767723, at *8 (concluding that "any [postwarning] statements that were made by [the defendant] . . . were made with full awareness of his rights" because he "signed a written waiver, clearly identified as such, that was also set forth in clear, simple, and concise language").

Normally, Fox's "voluntar[y], knowing[] and intelligent[]" waiver of her rights at the detention center would have been enough to admit her postwarning confessions into evidence. *Miranda*, 384 U.S. at 444. That is because "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving [her] rights and confessing after [s]he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318. But Agent Khatun did not make "a good-faith *Miranda* mistake, . . . posing no threat to warn-first practice generally." *See Seibert*, 542 U.S. at 615 (plurality opinion). Quite the opposite: she carried out the "unwarned interrogation . . . with psychological skill," *see id.* at 602 (plurality opinion), and by being friendly and nice with Fox in order to gain her trust and build rapport with her, (Hr'g Tr. 25:11-13, 26:6-7, 104:16-17, 121:10-13.) Indeed, Fox testified that Agent Khatun "was kind of befriending" her while they stopped at the parking lot on their way to the detention center. (*Id.* 117:15.) Looking at "the totality of the objective and subjective evidence surrounding [Fox's] interrogations," and "rely[ing] heavily, if not entirely, upon objective evidence," the court concludes that Agent Khatun deliberately elicited an un-*Mirandized* confession from Fox during the prewarning interrogation in the car, for the purpose of relying on that un-*Mirandized* confession to elicit a post-*Miranda* waiver and confession from Fox at the detention center. *Capers*, 627 F.3d at 479.

For example, during the prewarning interrogation, Agent Khatun asked Fox questions about the PPP and her businesses, while also comforting her. (*Id.* 101:20-102:1, 117:3-6.) Knowing that the

investigation related to PPP fraud, Agent Khatun intentionally asked these questions to "obtain[] an inadmissible, un-*Miran-dized* confession," and then, relying on Fox's answers, "ask[ed] [her] to repeat the confession post-warning." *See Hernandez,* 2025 WL 2025555, at *12 (acknowledging that this is precisely the kind of deliberate tactic that *Seibert* declared unconstitutional). One of Agent Khatun's first words after Fox executed the Waiver Form in the interrogation room was "let's pick up from where we left off," making it clear that she treated Fox's prewarning interrogation as step one of the two-step interrogation conducted in this case. (Recording of Second Custodial Interrogation at 0:03:06-10.) To do that, Agent Khatun and Agent Singh followed-up with more questions based on Fox's prewarning admission that she altered some of the PPP loan application documents. (Partial Recording of First Custodial Interrogation at 0:19:38-55; Recording of Second Custodial Interrogation at 0:19:47-21:02.) In this way, the agents' "reli[ance] on [Fox's] prewarning statement to obtain the postwarning statement . . . resembled a cross-examination." *Seibert,* 542 U.S. at 621. Indeed, even the Government admits that "the content in both interviews overlapped in part despite the elaboration (including the defendant's admission during both interviews that she participated in the PPP fraud), and Special Agent Khatun viewed the jail room interview as a continuation to the vehicle interview." (Gov't Opp. at 27.)

Moreover, although Agent Khatun initially testified that, "[b]esides the pre-op[eration] plan, [she] did not receive any material" related to the investigation, (Hr'g Tr. 24:22-25), her cross-examination revealed that she had an "Interview Outline" on her lap, containing numerous questions related to Fox's investigation, (*id.* 56:13-57:12; Partial Recording of First Custodial Interrogation at 0:00:19-22; Sealed Interview Outline (Dkt. 178-3) at 1-2.) The court also notes that Agent Khatun appeared to

rely extensively on the "Interview Outline" when asking questions during the prewarning interrogation in the car. (*See* Fox's Suppl. Findings & Conclusion at 3-5 (noting the similarity of questions listed in the Interview Outline with those Agent Khatun asked during the prewarning interrogation in the transport vehicle).) These circumstances further demonstrate that Agent Khatun deliberately asked predetermined questions to elicit Fox's confession so that she could ask similar questions after *Mirandizing* Fox to receive the same or similar answers. (*Id.* at 5-7 (showing the overlap between the outline and Agent Khatun's questions from the postwarning interrogation).) *Seibert* does not permit such tactics.

Having determined that Agent Khatun and her fellow law enforcement agents "deliberately engaged in a two-step interrogation practice," the court next concludes that there were no "intervening 'curative measures'" taken by Agent Khatun or others that "'allowed [Fox] to distinguish' the several rounds of questioning." *See Hernandez*, 2025 WL 2025555, at *13 (quoting *Seibert*, 542 U.S. at 622). First, there was no "substantial break in time and circumstances between the prewarning statement and the *Miranda* warning." *See Seibert*, 542 U.S. at 622. Only a few hours elapsed between the time of Fox's arrest at approximately 5:00 or 6:00 p.m., the 30- to 40-minute car ride and prewarning interrogation, and the start of the detention center interrogation at approximately 8:09 p.m. (Hr'g Tr. 17:11-23, 25:1-5, 102:18-19; Recording of Second Custodial Interrogation at 0:02:18.) Fox made her inculpatory statements towards the end of the prewarning interrogation, which ended as the transport car approached the detention center. (Partial Recording of First Custodial Interrogation at 0:19:38-55.) Thereafter, upon arriving at the detention center, Fox was processed and brought into the interrogation room where Agent Khatun *Mirandized* her. (Recording of Second Custodial Interrogation at 0:01:23-02:04.)

Nor was law enforcement personnel at the interrogation room substantially different. Although the second interrogation took place in a different location, Agent Khatun continued as the lead interviewer, accompanied by Agent Singh. (Hr'g Tr. 26:6-7.) And while it is true that Agent Pishchulin was also in the interview room, he barely asked any questions throughout the interrogation. (*Id.* 28:19-21.) Lastly, none of the agents in the interrogation room made "an additional warning . . . explain[ing] the likely inadmissibility of [Fox's] prewarning custodial statement[s]" made in the car. *See Seibert,* at 542 U.S. at 622 (explaining that curative measures "allow[] the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn").

For all these reasons, Fox's "confession fits precisely the mold addressed in *Seibert*." *See Hernandez,* 2025 WL 2025555, at *13. As such, the court suppresses all of Fox's post-arrest statements made on June 13, 2023, as obtained in violation of her rights under the Fifth Amendment to the U.S. Constitution. Because the court finds a Fifth Amendment violation, it need not address the parties' arguments regarding fruits of the illegal search and admissibility under the Rules of Evidence.

## IV.  CONCLUSION

For the reasons set forth above, Fox's motion *in limine* to exclude her post-arrest statements is GRANTED and the Government's motion *in limine* to introduce the same statements into evidence is DENIED. The court further DIRECTS Fox to state the legal bases for admitting the Pre-Operation Plan, the Arrest Warrant, and the Interview Outline into evidence as part of her supplemental motions *in limine* for which the court has already set a briefing schedule.

SO ORDERED.


Dated:      Brooklyn, New York
            July ⟋ 1, 2025

                                        s/Nicholas G. Garaufis
                                        _____
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge